TWENTY-SEVENTH DEFENSE
(Pre-Existing Condition)

Bayer asserts that the injuries and/or damages alleged by Plaintiff, if any, were the result of a pre-existing condition or conditions that were unrelated to any conduct of, or medicine placed in the stream of commerce by, Bayer and/or over which Bayer had no control.

TWENTY-EIGHTH DEFENSE
(Act of God)

The injuries and/or damages alleged by Plaintiff, if any, may have been caused, in whole or in part, by operation of nature or act of God.

TWENTY-NINTH DEFENSE
(Alteration or Misuse)

Plaintiff's alleged injuries and/or damages, if any, were caused by the alteration, unintended use, or misuse of the medicines referred to in Plaintiff's complaint.

THIRTIETH DEFENSE
(Idiosyncratic Reaction)

With respect to each and every cause of action, Plaintiff is not entitled to recover for an idiosyncratic reaction.

THIRTY-FIRST DEFENSE
(Contributory/Comparative Negligence)

With respect to each and every cause of action, Plaintiff is not entitled to recover because of the doctrines of contributory and/or comparative negligence and comparative fault.

THIRTY-SECOND DEFENSE
(Failure to Mitigate)

With respect to each and every cause of action, Plaintiff is not entitled to recover because of failure to mitigate or minimize damages

other things, Comments J and K to Section 402 of the Restatement (Second) of Torts relegate Plaintiff to a negligence cause of action

THIRTY-EIGHTH DEFENSE
(Failure to Identify Manufacturer)

With respect to each and every cause of action, Plaintiff is not entitled to relief to the extent she is unable to prove the identity of the manufacturer of the precise medicines used by Plaintiff.

THIRTY-NINTH DEFENSE
(Learned Intermediary Doctrine)

Bayer asserts the application of the learned intermediary doctrine which requires that all necessary warnings and other appropriate information be delivered by the treating physician or health care provider.

FORTIETH DEFENSE
(Fundamental Fairness)

With respect to each and every cause of action, Plaintiff is not entitled to recover because of the delay and the fundamental unfairness and prejudice due to the excessive delay from the date of use of the medicine until the filing of the complaint.

FORTY-FIRST DEFENSE
(Right to Set-Off/Credit)

To the extent Bayer and any entity or person contributed to Plaintiff's damages, if any, then Bayer asserts the application of Minn. Stat. § 548 19 In the event Bayer is found jointly or severally liable with another tortfeasor or with multiple tortfeasors, Bayer reserves its right of contribution to the extent it has to pay more than its pro rata share of the common liability consistent with provisions as set out in Minn. Stat § 548 19. Bayer further states that it expressly reserves the right, in the event that Plaintiff settles with other Defendants, to seek a credit/set-off for any proximal negligence that may be attributed to said settling Defendant If

THIRTY-THIRD DEFENSE
(Intervening Negligence)

With respect to each and every cause of action, Plaintiff is not entitled to recover because of intervening acts and/or omissions of persons or entities other than Bayer Corporation

THIRTY-FOURTH DEFENSE
(Unavoidably Unsafe)

With respect to each and every cause of action, Plaintiff is not entitled to recover because if the medicines were unsafe, which Bayer denies, then they were unavoidably unsafe. The apparent benefits of the medicines exceeded any apparent risk given the scientific knowledge available and the medicines marketed

THIRTY-FIFTH DEFENSE
(No Express/Implied Warranty)

Bayer denies making any express or implied warranties to Plaintiff. In the alternative, Bayer alleges that any and all warranties that may form a basis for Plaintiff's claims were adequately disclaimed In the alternative, Plaintiff failed to give timely notice of the breach of warranty claims, as required by Minn Stat. § 336.2-607, and Plaintiff is therefore barred from any recovery in this action.

THIRTY-SIXTH DEFENSE
(Sophisticated Purchaser)

Bayer hereby gives notice that to the extent the sophisticated purchaser doctrine is applicable to any of the allegations contained in the Complaint, these Defendants intend to rely upon same in defense of this action

THIRTY-SEVENTH DEFENSE
(No Strict Liability)

With respect to each and every cause of action, Plaintiff is not entitled to recover for strict liability because Plaintiff cannot state claims sounding in strict liability because, among

the jury agrees with Plaintiff's position, Bayer requests that fault be allocated to the settling Defendant Bayer intends to rely, in part, on the witnesses and evidence produced by others, including witnesses retained by Plaintiff. Bayer reserves the right to read portions of the depositions and use evidence necessary regarding allocation of fault even if other Defendants settle before trial.

FORTY-SECOND DEFENSE
(No Particularity)

Plaintiff's allegations of fraud, deceit, and fraudulent misrepresentations, are not stated with the degree of particularity required by Fed.R.Civ.P. 9(b) and should be dismissed.

FORTY-THIRD DEFENSE
(*Forum Non Conveniens*)

The venue of Plaintiff's action should be changed under the doctrine of *forum non conveniens*

**AMENDMENTS**

Bayer specifically reserves the right to amend its answer by adding defenses, counterclaims, cross-claims, or by instituting third-party actions as additional facts are obtained through further investigation and discovery

To the extent any other defendant raises any defense or issue which would exonerate Bayer, or bar recovery against Bayer, Bayer incorporates these Answers or Defenses by reference.

WHEREFORE, Bayer prays for judgment as follows:

1 That Plaintiff is not entitled to equitable relief;

2. That Plaintiff take nothing by the complaint;

3. For such other and further relief as the court may deem just and proper.

This 2d day of November, 2001

Respectfully submitted,
BAYER CORPORATION

Terry O. Tottenham
Texas State Bar No. 20147500
Lana K. Varney
Texas State Bar No. 20499500
FULBRIGHT & JAWORSKI L L.P.
600 Congress Avenue
Suite 2400
Austin, Texas 78701
Telephone (512) 474-5201
Facsimile (512) 536-4598

Ronn B Kreps
Minnesota State Bar No. 151142
Nicholas A.J. Vlietstra
Minnesota State Bar No. 241532
FULBRIGHT & JAWORSKI L.L.P.
225 South Sixth Street
Suite 4850
Minneapolis, MN 55402-4320
Telephone: (612) 321-2800
Facsimile. (612) 321-9600

ATTORNEYS FOR DEFENDANT
BAYER CORPORATION

## AFFIDAVIT OF SERVICE BY MESSENGER

STATE OF MINNESOTA )
) ss
COUNTY OF HENNEPIN)

DaMetria Walker, being first duly sworn on oath deposes and says, that (s)he is a messenger, and that on the 2nd day of November, (s)he served the attached.

Answer and Defenses of Bayer Corporation

upon

Ronald S. Goldser, Esq.
Timothy J. Becker, Esq
Zimmerman Reed, P L.L.P
~~901 North Third Street~~ 651 n. collet Mall
~~Suite 100~~ Ste 501
Minneapolis, MN ~~55401~~ 55402

by hand-delivery to such person at such address.

Left with
Chayo Guzman, Clerk

Subscribed and sworn to before me
this 2nd day of November, 2001

Notary Public

BRENDA GUNDERSON
Notary Public
Minnesota
My Commission Expires Jan 31, 2005

Original
to be filed.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| PATRICIA ANN MEDINA, as Trustee on behalf of heirs of VICTORIA TRUJILLO, Decedent,<br><br>Plaintiff,<br><br>vs<br><br>BAYER CORPORATION and BAYER PHARMACEUTICAL DIVISION,<br><br>Defendants. | Court File No. 01-1868 JRT/FLN<br><br>**FIRST AMENDED COMPLAINT**<br>**(Jury Trial Demanded)** |

All allegations made in this Complaint are based upon information and belief except those allegations which pertain to the representative Plaintiff[1] and her counsel, which are based upon personal knowledge

## INTRODUCTION

1 Phenylpropanolamine ("PPA"), is a drug and an active ingredient in over-the-counter decongestant medication PPA has been on the market for over sixty years but has never been approved by the Food and Drug Administration ("FDA") as safe and effective. In 1938, the Federal Food, Drug & Cosmetics Act was enacted, requiring that drugs be demonstrated as safe before being marketed, but drugs containing PPA were not reviewed because they had been on the market for several years prior to the passage of the Federal Food, Drug & Cosmetics Act. In 1972, an Over-the-Counter Drug Review was initiated and ingredients of over-the-counter medications were reviewed for safety and efficacy In 1976, an advisory panel reviewed PPA and recommended it be considered safe and effective for use as a

[1] Hereinafter, references to Plaintiff refer to Plaintiff's decedent.

FILED 10/17/01
RICHARD D SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY

3

or issued a final monograph covering decongestants containing PPA. The FDA has never determined that the use of PPA is safe. On November 6, 2000, the FDA requested that manufacturers voluntarily cease marketing products containing PPA due to the serious adverse health risks associated with PPA

2. PPA has been associated with hemorrhagic stroke, seizure, heart attacks, arrhythmias, psychosis and death. A significant number of strokes have been reported to the FDA since 1970. In addition to stroke, seizure, heart attacks, arrhythmias, psychosis and death, clinical signs and symptoms associated with PPA include. hypertension; throbbing bilateral headaches; nausea and emesis, anxiety; palpitations; seizures, paresthesias; tremor; hallucinations; tachycardia, ventricular ectopy or tachycardia; myalgias; reversible renal failure; increased intracerebral pressure verified by lumbar puncture; disorientation to person, place or time; paranoia; "bizarre" behavior, and suicidal behavior

3 Defendants have manufactured, promoted and marketed products containing PPA directly to consumers by making representations regarding the safety of their products and misrepresentations or omissions regarding the risks of their products Through their representations, misrepresentations and omissions, Defendants failed to properly advise consumers of the known risks of PPA Accordingly, consumers purchased Defendants' products which contained PPA without knowledge of the fact that they were not purchasing safe drugs, but rather drugs that exposed them to stroke, life-threatening heart problems and other adverse medical conditions Knowledge of these risks should not have been withheld from consumers, and by withholding this information, Defendants made it impossible for consumers to evaluate the risks of the products. Consumers would have wanted to know of these risks when comparing them to the drugs' intended benefit – decreased nasal congestion

4 Plaintiff ingested products containing PPA. As a direct and proximate result of ingesting PPA, Plaintiff died

5 This complaint is brought on behalf of Victoria Trujillo, Decedent, who purchased and ingested products manufactured and distributed by the Defendants which contained PPA.

## JURISDICTION

6 This Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.00 exclusive of interest and costs and there is complete diversity of citizenship between Plaintiff and the Defendants

7 Venue is proper in this federal district under 28 U S.C. § 1391 because Defendants conduct business in this federal district and sold its products in this district This Court has personal jurisdiction over Defendants because they intentionally conducted business in the State of Minnesota, including, but not limited to, intentionally marketing, advertising and selling its products to persons in Minnesota.

## PARTIES

8. Ms Patricia Medina, as Trustee on behalf of heirs of Ms Victoria Trujillo, Decedent, is a citizen of the United States and of Colorado Plaintiff purchased and/or ingested Defendants' products containing PPA in order to treat her cold, flu and/or allergy symptoms

9. Defendant Bayer Corporation is a corporation with its principal place of business in Pittsburgh, Pennsylvania. At all relevant times herein, Bayer Corporation was in the business of promoting, manufacturing and distributing products containing PPA. Defendant does business in this State and this federal district, and at all relevant times hereto, marketed, promoted, warranted and sold their products containing PPA in this State

10 Defendant Bayer Pharmaceutical Division has its principal place of business in West

Haven, Connecticut. At all relevant times herein, Bayer Pharmaceutical Division was in the business of promoting, manufacturing and distributing products containing PPA Bayer Pharmaceutical Division does business in Minnesota

**FACTUAL ALLEGATIONS**

11 At all relevant times hereto, Defendants were designers, manufacturers, marketers, advertisers, distributors, and sellers of non-prescription, over-the-counter pharmaceutical products, including cold, flu and allergy remedy products, which contained PPA as an active ingredient, including: Alka Seltzer Plus Cold & Cough Medicine Effervescent (hereinafter "Alka Seltzer Plus") Alka Seltzer Plus was purposefully and regularly distributed, marketed, advertised and sold throughout Minnesota and the United States

12. At all times pertinent to this cause of action, Defendants acted by and through their agents and/or employees who were acting within the course, scope and authority, apparent or actual, of such agency and/or employment. Where it is alleged that Defendants committed any act and/or omission or engaged in any conduct, it is meant that the Defendants committed such act and/or omission or engaged in such conduct by and through their agents and/or employees, and that at the time of such act, omission or conduct, it occurred with the full authorization or ratification of Defendants and/or occurred in the normal and routine course and scope of the agency or employment of such agent or employee of Defendants

13 Plaintiff lived in Pueblo, Colorado. From time to time when she or a family member exhibited cold, flu and/or allergy symptoms, she purchased certain over-the-counter, non-prescription drugs, including Alka Seltzer Plus to remedy the illness In particular, Plaintiff consumed Alka Seltzer Plus shortly on or before November 4, 1998, the date of death Plaintiff died from an intracerebral hemorrhage, commonly known as a stroke. Such illness was caused in

substantial part by the adverse effects of PPA contained in Alka Seltzer Plus.

14. Based upon Defendants' promotions, marketing, advertisements and other representations, Plaintiff purchased the Alka Seltzer Plus believing it was safe for herself and her family members to ingest However, unbeknownst to Plaintiff, Defendants' Alka Seltzer Plus was not safe as marketed and distributed, in that the products contained PPA as an active ingredient and failed to warn of the dangers associated with the ingestion of PPA.

15 PPA is a sympathomimetic drug closely related to amphetamines which have been known in the medical and scientific communities for decades to cause life-threatening and/or fatal adverse effects to the cardiovascular and neurological systems. At all times relevant to this Complaint, Defendants had detailed knowledge of the risks of PPA

16. PPA is a vaso-constrictor, causing the constriction of blood vessels. This process raises blood pressure and causes hypertension When blood pressure is raised to a critical level and there is an increased myocardial oxygen demand, heart attacks and/or cardiac arrhythmia can result, as well as hemorrhagic strokes, due to the increased intra-vascular pressure, among other adverse effects.

17. For at least two decades, Defendants were aware, or should have been aware, of the numerous scientific journal articles, as well as incident reports, textbooks, and other reports of serious life threatening adverse effects from human consumption of PPA, including stroke, seizure, heart attack, arrhythmias, psychosis and death. Despite these serious and potentially fatal reactions from an active ingredient found in Alka Seltzer Plus, Defendants failed to warn the general public, including Plaintiff, of the risks involved in ingesting PPA.

18. At all times relevant to these allegations, and on information and belief, Defendants were members of the Non-Prescription Drug Manufacturers Association (hereinafter referred to as

"NDMA," the NDMA is currently known as the Consumer Healthcare Products Association) Over the past two decades, Defendants, as members of the NDMA, upon information and belief, undoubtedly were made aware of and participated in numerous communications and discussions directly related to the safety and known adverse effects of products containing PPA.

19 Members of the NDMA (including Defendants) and the NDMA's PPA Task Force had actual knowledge of the scientific community's concerns regarding PPA and of the numerous articles and reports of evidencing the association between PPA and strokes, arrhythmia, heart attack and death

20. In 1994, members of the NDMA and the PPA Task Force, had direct knowledge of at least one manufacturer and distributor (Thompson Medical Company) of over-the-counter, non-prescription drugs containing PPA that reported several life threatening reactions to PPA and voluntarily added "black box" warning labels to its products which contained PPA. Such products warned that· "There have been reports that stroke, seizure, heart attacks, arrhythmias, psychosis, and death might be associated with the ingestion of Phenylpropanolamine." Despite the feasibility and ease with which Defendants could have warned consumers about the dangers of Alka Seltzer Plus, Defendants failed to do so, and the consumers who purchased and/or ingested Alka Seltzer Plus were never warned or informed of these health dangers

21. Defendants represented or impliedly represented that Alka Seltzer Plus was safe and did not pose a risk of stroke, seizure, heart attacks, arrhythmias, psychosis, and death.

22 The NDMA and the industry of which the Defendants were part, reviewed medical and scientific literature regarding products containing active ingredients such as PPA and participated in discussions concerning the safety of PPA Products, like those manufactured, sold and distributed by Defendants.

23. Defendants and other members of NDMA, directly or indirectly, participated in the funding of purported studies on the safety of PPA, when they knew the inaccuracies and inadequacies of said studies.

24. Defendants, in concert with other over-the-counter non-prescription drug manufacturers, thwarted the FDA from accurately and completely conducting full fact-finding studies on the safety of PPA.

25 Pharmaceutical companies, such as Defendants, have a professional and ethical duty to inform and warn the public, especially those purchasing their products, of known adverse and dangerous side effects associated with their products or active ingredients in their products.

26. Life threatening adverse effects related to PPA leading to hospitalization and/or death have been well documented and known to pharmaceutical companies, including Defendants, for decades These life threatening events have been documented through FDA warning/sentinel events systems, showing a large number of such events related to PPA Several life threatening PPA injuries have been reported in Clin-Alert and other medical reports.

27. PPA manufacturer-sponsored research efforts on safety, of which Defendants either participated in and/or sponsored, lacked validity because the studies failed to systematically study the arrhythmogenic potential and known cardiac effects of PPA, or, until just before products containing PPA were withdrawn from the market, the potential neurological impact of PPA ingestion Defendants failed to perform such studies despite the feasability and compelling medical justification to do so

28. Defendants marketed Alka Seltzer Plus as safe and effective for these purposes. However, Defendants did not perform adequate testing of Alka Seltzer Plus to ensure its safety. In fact, many reports indicated the active ingredient PPA was not safe

29. Defendants' intended Alka Seltzer Plus to function as an over-the-counter cold, flu and allergy product However, Alka Seltzer Plus was not sufficiently or properly tested prior to being marketed to the public or at any time while being marketed to the public. Testing of Alka Seltzer Plus's effects on the central nervous system or cardiovascular system was not performed over a reasonable period of time during the distribution and sale of Alka Seltzer Plus to the public Nevertheless, Defendants represented Alka Seltzer Plus to be pharmaceutically tested and safe for consumption.

30. Defendants have concealed material facts, including the serious risks associated with ingesting PPA, from Plaintiff in product packaging, labeling, advertising, promotional campaigns and materials, among other ways, regarding the safety and use of products containing PPA

**FIRST CAUSE OF ACTION**

(Strict Liability - Failure to Warn)

31. Plaintiff restates and realleges each allegation set forth in paragraphs 1 through 30 as it stated herein

32 Products containing PPA were defective at the time of its manufacture, development, production, testing, inspection, endorsement, sale and distribution, in that, and not by way of limitation, said product and its warnings, instructions and directions failed to warn of the dangerous propensities of said product, which risks were known or should have been scientifically known to Defendants Defendants, knew or should have known, of the defective condition, characteristics and risks associated with said product, as previously set forth herein.

33. At all times herein mentioned, the aforementioned product was defective, and Defendants, knew or should have known, that the product was to be used by the user without inspection for defects therein. Moreover, Plaintiff neither knew, nor had reason to know, at the time

of the use of the subject product, of the existence of the aforementioned defects.

34. As a direct and proximate result of the defective condition of the aforementioned product, Plaintiff died incurring damages in an amount that exceeds $75,000.00

**SECOND CAUSE OF ACTION**

(Negligence)

35 Plaintiff restates and realleges each allegation set forth in paragraphs 1 through 35 as it stated herein

36 At all times herein mentioned, Defendants had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, prepare for use, sell, prescribe and adequately warn of the risks and dangers of the aforementioned product

37 At all times herein mentioned, Defendants negligently and carelessly manufactured, designed, formulated, compounded, produced, processed, assembled, inspected, distributed, marketed, labeled, packaged, prepared for use and sold the aforementioned product and failed to adequately test and warn of the risks and dangers of the aforementioned product.

38. The Defendants impliedly or expressly represented that Alka Seltzer Plus was safe for use and would not cause the adverse health effects described herein

39. As a direct and proximate result of said negligence and carelessness, Plaintiff died incurring damages in an amount that exceeds $75,000.00

**THIRD CAUSE OF ACTION**

(Negligence Per Se)

40 Plaintiff restates and realleges each allegation set forth in paragraphs 1 through 39 as it stated herein.

41 At all times herein mentioned, Defendants had an obligation not to violate the law, in the manufacture, design, formulation, compounding, testing, production, processing, assembly, inspection, research, distribution, marketing, labeling, packaging, preparation for use, sale and warning of the risks and dangers of the aforementioned product.

42. At all times herein mentioned, Defendants violated the Federal Food, Drug and Cosmetic Act, 21 U S C. Section 301, et seq., related amendments and codes and federal regulations provided thereunder, the Sherman Food, Drug and Cosmetic Law, and other applicable laws, statutes and regulations

43. Plaintiff, as a purchaser and consumer of the product, is within the class of persons the statutes and regulations described above are designed to protect, and Plaintiff's injuries are the type of harm these statutes are designed to prevent

44. Defendants' acts constitute an adulteration and/or misbranding as defined by the Federal Food, Drug and Cosmetic Act, 21 U S C § 331, and constitutes a breach of duty subjecting defendants to civil liability for all damages arising therefrom, under theories of negligence per se

45 Defendants failed to meet the standard of care set by the following statutes and regulations, which were intended for the benefit of individuals such as Plaintiff, making Defendants negligent per se (a) The labeling lacked adequate information on the use of the drug containing PPA [21 C F R. Section 201.56(a) and (d)], (b) The labeling failed to provide adequate warnings of severe and disabling medical conditions including, without limitation: stroke, seizure, heart attacks, arrhythmias, psychosis, other adverse medical conditions and death as soon as there was reasonable evidence of their association with the drug [21 C F R 201 57(e)], (c) There was inadequate information for patients for the safe and effective use of Defendants' drug [C.F.R. 201.57(f)(2)]; (d) There was inadequate information regarding special care to be exercised by the doctor for safe and

effective use of Defendants' drugs [21 C F R. 201.57(f)(1)]; and (e) The labeling was misleading and promotional [21 C.F.R 201 56(b)].

46 As a direct and proximate result of the violations of the statutes described above, Plaintiff died incurring damages in an amount that exceeds $75,000 00.

**FOURTH CAUSE OF ACTION**

(Breach of Implied Warranty)

47. Plaintiff restates and realleges each allegation set forth in paragraphs 1 through 46 as it stated herein.

48 Prior to the time that the aforementioned product was used by Plaintiff, Defendants impliedly warranted to Plaintiff that said product was of merchantable quality and safe and fit for the use for which it was intended.

49 Plaintiff was unskilled in the research, design and manufacture of the aforementioned product and reasonably relied entirely on the skill, judgment and implied warranty of the Defendants in using the aforementioned product.

50 The aforementioned product was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that it had dangerous propensities when put to its intended use and would cause severe injuries to the user.

51. As a direct and proximate result of the aforementioned breach of implied warranties by the Defendants, Plaintiff died incurring damages in an amount that exceeds $75,000.00.

**FIFTH CAUSE OF ACTION**

(Breach of Express Warranty)

52. Plaintiff restates and realleges each allegation set forth in paragraphs 1 through 51 as it stated herein.

53. At all times herein mentioned, Defendants expressly warranted to Plaintiff, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for the general public, that the aforementioned product was safe, effective, fit and proper for its intended use.

54 In utilizing the aforementioned product, Plaintiff relied on the skill, judgment, representations and foregoing express warranties of the Defendants. Said warranties and representations were false in that the aforementioned product was not safe and was unfit for the uses for which it was intended

55. As a direct and proximate result of the foregoing breach of express warranties by the Defendants, Plaintiff died incurring damages in an amount that exceeds $75,000.00

**SIXTH CAUSE OF ACTION**

(Deceit by Concealment)

56. Plaintiff restates and realleges each allegation set forth in paragraphs 1 through 55 as it stated herein.

57 Defendants from the time that the aforementioned product was first manufactured, marketed and distributed, and up to the present, willfully deceived Plaintiff by concealing from the Plaintiff and the general public, the true facts concerning said pharmaceutical product, which the Defendants, as manufacturers, marketers, and distributors of the product, had a duty to disclose.

58 At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of the aforementioned drug product and willfully deceived Plaintiff and the general public as to the health risks and consequences of the use of the aforementioned product Defendants were aware of the foregoing, and that the aforementioned product was not safe, fit and effective for human consumption, the use of said product is hazardous to health, and said product

has serious propensity to cause serious injuries to users, including but not limited to death of Plaintiff as delineated herein.

59. Defendants intentionally concealed and suppressed the true facts concerning said pharmaceutical product with the intent to defraud Plaintiff, in that the Defendants knew, or should have known, Plaintiff would not have used the subject product, if aware of the true facts concerning the dangers of said product.

60 As a direct and proximate result of the foregoing fraudulent and deceitful conduct by Defendants, Plaintiff died incurring damages in an amount that exceeds $75,000.00.

**SEVENTH CAUSE OF ACTION**

(Negligent Misrepresentation)

61 Plaintiff restates and realleges each allegation set forth in paragraphs 1 through 60 as it stated herein

62. Defendants from the time that the aforementioned product was first manufactured, marketed and distributed, and up to the present, made false misrepresentations, as previously set forth herein, to Plaintiff, including but not limited, to the misrepresentation that said pharmaceutical product, alone and in combination, was safe, fit and effective for human consumption. At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of the aforementioned drug product and willfully deceived Plaintiff and the general public as to the health risks and consequences of the use of the aforementioned product.

63 The Defendants made the foregoing representations without any reasonable ground for believing them to be true These representations were made directly by Defendants, by sales representatives and other authorized agents of said Defendants, and in publications and other written materials directed to the public, with the intention of inducing reliance, purchase and use of the

subject matter

64. The foregoing representations by the Defendants were in fact false, in that the aforementioned product was not safe, fit and effective for human consumption, the use of said product is hazardous to health, and said product has a serious propensity to cause serious injuries to users, including but not limited to the death of Plaintiff as delineated herein

65. The foregoing representations by Defendants were made with the intention of inducing reliance, purchase and use of the subject product.

66. In reliance on Defendants' misrepresentations, Plaintiff was induced to purchase and use the use of the aforementioned product If Plaintiff had known of the true facts and the facts concealed by Defendants, Plaintiff would not have used the subject product. The reliance of Plaintiff upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities who were in a position to know the true facts.

67 As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff died incurring damages in an amount that exceeds $75,000 00.

## EIGHTH CAUSE OF ACTION

(Minnesota Deceptive Trade Practices Act § 325D *et seq.*)

68. Plaintiff restates and realleges each allegation set forth in paragraphs 1 through 67 as it stated herein.

69 Minn Stat §§ 325D.13 and 325D 44 prohibit falsely advertising or representing the quality and/or ingredients of goods or merchandise sold in Minnesota.

70. Defendants engaged in acts and practices, as described in this Complaint, which mislead the general public in violation of these consumer protection statutes. Defendants have advertised, marketed and sold this drug through the use of misleading, incomplete and deceptive

advertising, promotion and product identification, in violation of the consumer protection statutes of this State.

71 At all times herein mentioned Defendants violated Minnesota's Deceptive Trade Practices Act by disseminating untrue and misleading statements and engaging in conduct likely to deceive consumers, by engaging in acts and practices with intent to induce Plaintiff to purchase Alka Seltzer Plus.

72. This conduct includes, but is not limited to, representing to Plaintiff that Alka Seltzer Plus, and all its ingredients, were safe, fit and effective for human consumption, knowing that said representations were false, and concealing from Plaintiff that said product had a serious propensity to cause injuries to users, and purposely downplaying and understating the health hazards and risks associated with this drug.

73 The foregoing practices constitute false and misleading advertising, unlawful trade practices, and deceptive trade practices within the meaning of Minnesota's Deceptive Trade Act.

74 As a result of their conduct described above Defendants have been, and will be, unjustly enriched Specifically, Defendants have been unjustly enriched by receipt of millions of dollars from the sale of said drugs, sold in large part as a result of the acts and omissions described herein

75 Because of the fraudulent misrepresentations made by Defendants as detailed above, and the inherently unfair practice of committing a fraud against the public by misrepresenting and concealing material information, the acts of Defendants described herein constitute a deceptive trade practice

76. As a direct and proximate result of Defendants' violation of Minnesota's Deceptive Trade Practices Act, Plaintiff died incurring damages in an amount that exceeds $75,000.00

**NINTH CAUSE OF ACTION**

(Minnesota Consumer Fraud Act § 325F *et seq.*)

77. Plaintiff restates and realleges each allegation set forth in paragraphs1 through 76 as it stated herein.

78. Minnesota Statute §§ 325F 67 and 325F.69 prohibit, false advertising and fraudulent business practices in the sale of goods in Minnesota.

79 At all times herein mentioned Defendants violated Minnesota's Consumer Fraud Act by disseminating untrue and misleading statements and engaging in conduct likely to deceive consumers, by engaging in acts and practices with intent to induce Plaintiff to purchase Alka Seltzer Plus.

80 This conduct includes, but is not limited to, representing to Plaintiff that Alka Seltzer Plus was safe, fit and effective for human consumption, knowing that said representations were false, and concealing from Plaintiff that said product had a serious propensity to cause injuries to users, and purposely downplaying and understating the health hazards and risks associated with this drug

81 The foregoing practices constitute false and misleading advertising, unlawful trade practices, and deceptive practices within the meaning of Minnesota's Consumer Fraud Act

82. As a result of their conduct described above Defendants have been and will be unjustly enriched Specifically, Defendants have been unjustly enriched by receipt of millions of dollars from the sale of said drugs, sold in large part as a result of the acts and omissions described herein

83 Because of the fraudulent misrepresentations made by Defendants as detailed above, and the inherently unfair practice of committing a fraud against the public by misrepresenting and concealing material information, the acts of Defendants described herein constitute a violation of

Minnesota Consumer Protection Act

84. As a direct and proximate result of Defendants' violation of Minnesota's Consumer Fraud Act, Plaintiff died incurring damages in an amount that exceeds $75,000.00

WHEREFORE, Plaintiff requests judgment against Defendants, and each of them, as follows.

1 Damages in an amount to compensate the Plaintiff's heirs for all damages including exemplary damages if applicable to which they are entitled by law,

2. For legal interest on all damages awarded from date of judicial demand until paid;

3. For attorneys's fees, including but not limited to fees specifically award under Minnesota's Consumer Fraud Statutes,

4 For an accounting and disgorgement of the profits Defendants enjoyed as a result of their illegal conduct,

5. For an order permanently enjoining Defendants' from selling products containing PPA;

6. For the costs of this litigation, and

7 For any other relief as this Court may deem equitable and just

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted this 16th day of October, 2001.

ZIMMERMAN REED, P L.L.P

Ronald S. Goldser - #35932
Timothy J. Becker - #256663
901 North Third Street
Suite 100
Minneapolis, Minnesota 55401
(612) 341-0400
Attorneys for Plaintiff

## AFFIDAVIT OF SERVICE BY MAIL

STATE OF MINNESOTA )
)ss
COUNTY OF WRIGHT )

Jessica L Anderson, of the City of Monticello, County of Wright in the State of Minnesota, first being duly sworn, says that on the 16th day of October, 2001 she served the annexed **FIRST AMENDED COMPLAINT** by mailing a true and correct copy thereof, enclosed in an envelope, postage prepaid, and by depositing the same in the post office at Minneapolis, Minnesota directed to said attorney(s) at the address listed below:

Bayer Corporation
c/o CT Corporation Systems
1515 Market Street
Philadelphia, PA 19102

Bayer Pharmaceutical Division
Attn. Person Authorized to Accept Service
400 Morgan Lane
New Haven, CT 06516

Jessica L. Anderson

Subscribed and sworn to before me
this 16th day of October, 2001

Notary Public

JULIANNE M. VANNORMAN
NOTARY PUBLIC - MINNESOTA
ANOKA COUNTY
My Commission Expires Jan. 31, 2005

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

PATRICIA ANN MEDINA, as Trustee on behalf of heirs of VICTORIA TRUJILLO, Decedent,

Plaintiff,

vs.

BAYER CORPORATION and BAYER PHARMACEUTICAL DIVISION,

Defendants.

Court File No.

**NOTICE OF CHANGE OF ADDRESS**

Please take note that effective **October 31, 2001** the address for the Minneapolis, Minnesota office of Zimmerman Reed, PLLP and its attorney(s) noted below will be.

**Zimmerman Reed, PLLP**
**651 Nicollet Mall, Suite 501**
**Minneapolis, MN 55402**
**Telephone: 612-341-0400**
**Fax: 612-341-0844**

Email addresses for Zimmerman Reed, PLLP attorneys and staff will remain unchanged.

Dated: 10/11/01

ZIMMERMAN REED, P.L.L.P.

By ______________________
Ronald S. Goldser - #35932
Timothy J. Becker - #256663
901 North Third Street
Suite 100
Minneapolis, Minnesota 55401
(612) 341-0400

Attorneys for Plaintiff

(2)

FILED OCT 1 1 2001
RICHARD D SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

PATRICIA ANN MEDINA, as Trustee on behalf of heirs of VICTORIA TRUJILLO, Decedent,

Plaintiff,

vs

BAYER CORPORATION and BAYER PHARMACEUTICAL DIVISION,

Defendants

Court File No 01-1868 JRT/FLN

**COMPLAINT (Jury Trial Demanded)**

All allegations made in this Complaint are based upon information and belief except those allegations which pertain to the representative Plaintiff[1] and her counsel, which are based upon personal knowledge.

**INTRODUCTION**

1 Phenylpropanolamine ("PPA"), is a drug and an active ingredient in over-the-counter decongestant medication. PPA has been on the market for over sixty years but has never been approved by the Food and Drug Administration ("FDA") as safe and effective. In 1938, the Federal Food, Drug & Cosmetics Act was enacted, requiring that drugs be demonstrated as safe before being marketed, but drugs containing PPA were not reviewed because they had been on the market for several years prior to the passage of the Federal Food, Drug & Cosmetics Act. In 1972, an Over-the-Counter Drug Review was initiated and ingredients of over-the-counter medications were reviewed for safety and efficacy In 1976, an advisory panel reviewed PPA and recommended it be considered safe and effective for use as a decongestant, however, the FDA never adopted that recommendation

[1] Hereinafter, references to Plaintiff refer to Plaintiff's decedent.

(1)

FILED OCT 1 1 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

or issued a final monograph covering decongestants containing PPA. The FDA has never determined that the use of PPA is safe. On November 6, 2000, the FDA requested that manufacturers voluntarily cease marketing products containing PPA due to the serious adverse health risks associated with PPA

2 PPA has been associated with hemorrhagic stroke, seizure, heart attacks, arrhythmias, psychosis and death. A significant number of strokes have been reported to the FDA since 1970 In addition to stroke, seizure, heart attacks, arrhythmias, psychosis and death, clinical signs and symptoms associated with PPA include: hypertension; throbbing bilateral headaches, nausea and emesis; anxiety; palpitations; seizures, paresthesias; tremor; hallucinations; tachycardia, ventricular ectopy or tachycardia; myalgias; reversible renal failure; increased intracerebral pressure verified by lumbar puncture; disorientation to person, place or time; paranoia; "bizarre" behavior, and suicidal behavior.

3 Defendants have manufactured, promoted and marketed products containing PPA directly to consumers by making representations regarding the safety of their products and misrepresentations or omissions regarding the risks of their products. Through their representations, misrepresentations and omissions, Defendants failed to properly advise consumers of the known risks of PPA. Accordingly, consumers purchased Defendants' products which contained PPA without knowledge of the fact that they were not purchasing safe drugs, but rather drugs that exposed them to stroke, life-threatening heart problems and other adverse medical conditions. Knowledge of these risks should not have been withheld from consumers, and by withholding this information, Defendants made it impossible for consumers (and physicians) to evaluate the risks of the products Consumers (and physicians) would have wanted to know of these risks when comparing them to the drugs' intended benefit – decreased nasal congestion.

4. Plaintiff ingested products containing PPA. As a direct and proximate result of ingesting PPA, Plaintiff died.

5. This complaint is brought on behalf of Victoria Trujillo, Decedent, who purchased and ingested products manufactured and distributed by the Defendants which contained PPA

**JURISDICTION**

6 This Court has jurisdiction over this civil action pursuant to 28 U.S.C § 1332. The amount in controversy exceeds $75,000.00 exclusive of interest and costs and there is complete diversity of citizenship between Plaintiff and the Defendants

7. Venue is proper in this federal district under 28 U.S.C. § 1391 because Defendants conduct business in this federal district and sold its products in this district. This Court has personal jurisdiction over Defendants because they intentionally conducted business in the State of Minnesota, including, but not limited to, intentionally marketing, advertising and selling its products to persons in Minnesota.

**PARTIES**

8. Ms. Patricia Medina, as Trustee on behalf of heirs of Ms. Victoria Trujillo, Decedent, is a citizen of the United States and of Mississippi. Plaintiff purchased and/or ingested Defendants' products containing PPA in order to treat her cold, flu and/or allergy symptoms.

9 Defendant Bayer Corporation is a corporation with its principal place of business in Pittsburgh, Pennsylvania. At all relevant times herein, Bayer Corporation was in the business of promoting, manufacturing and distributing products containing PPA Defendant does business in this State and this federal district, and at all relevant times hereto, marketed, promoted, warranted and sold their products containing PPA in this State.

10. Defendant Bayer Pharmaceutical Division has its principal place of business in West

Haven, Connecticut. At all relevant times herein, Bayer Pharmaceutical Division was in the business of promoting, manufacturing and distributing products containing PPA Bayer Pharmaceutical Division does business in Minnesota

**FACTUAL ALLEGATIONS**

11. At all relevant times hereto, Defendants were designers, manufacturers, marketers, advertisers, distributors, and sellers of non-prescription, over-the-counter pharmaceutical products, including cold, flu and allergy remedy products, which contained PPA as an active ingredient, including: Alka Seltzer Plus Cold & Cough Medicine Effervescent (hereinafter "Alka Seltzer Plus") Alka Seltzer Plus was purposefully and regularly distributed, marketed, advertised and sold throughout Minnesota and the United States.

12. At all times pertinent to this cause of action, Defendants acted by and through their agents and/or employees who were acting within the course, scope and authority, apparent or actual, of such agency and/or employment. Where it is alleged that Defendants committed any act and/or omission or engaged in any conduct, it is meant that the Defendants committed such act and/or omission or engaged in such conduct by and through their agents and/or employees, and that at the time of such act, omission or conduct, it occurred with the full authorization or ratification of Defendants and/or occurred in the normal and routine course and scope of the agency or employment of such agent or employee of Defendants

13. Plaintiff lived in Jackson, Mississippi. From time to time when she or a family member exhibited cold, flu and/or allergy symptoms, she purchased certain over-the-counter, non-prescription drugs, including Alka Seltzer Plus to remedy the illness. In particular, Plaintiff consumed Alka Seltzer Plus shortly on or before November 4, 1998, the date of death Plaintiff died from an intracerebral hemorrhage, commonly known as a stroke. Such illness was caused in

substantial part by the adverse effects of PPA contained in Alka Seltzer Plus.

14. Based upon Defendants' promotions, marketing, advertisements and other representations, Plaintiff purchased the Alka Seltzer Plus believing it was safe for herself and her family members to ingest However, unbeknownst to Plaintiff, Defendants' Alka Seltzer Plus was not safe as marketed and distributed, in that the products contained PPA as an active ingredient and failed to warn of the dangers associated with the ingestion of PPA.

15 PPA is a sympathomimetic drug closely related to amphetamines which have been known in the medical and scientific communities for decades to cause life-threatening and/or fatal adverse effects to the cardiovascular and neurological systems. At all times relevant to this Complaint, Defendants had detailed knowledge of the risks of PPA.

16. PPA is a vaso-constrictor, causing the constriction of blood vessels This process raises blood pressure and causes hypertension. When blood pressure is raised to a critical level and there is an increased myocardial oxygen demand, heart attacks and/or cardiac arrhythmia can result, as well as hemorrhagic strokes, due to the increased intra-vascular pressure, among other adverse effects.

17. For at least two decades, Defendants were aware, or should have been aware, of the numerous scientific journal articles, as well as incident reports, textbooks, and other reports of serious life threatening adverse effects from human consumption of PPA, including stroke, seizure, heart attack, arrhythmias, psychosis and death. Despite these serious and potentially fatal reactions from an active ingredient found in Alka Seltzer Plus, Defendants failed to warn the general public, including Plaintiff, of the risks involved in ingesting PPA.

18 At all times relevant to these allegations, and on information and belief, Defendants were members of the Non-Prescription Drug Manufacturers Association (hereinafter referred to as

"NDMA;" the NDMA is currently known as the Consumer Healthcare Products Association). Over the past two decades, Defendants, as members of the NDMA, upon information and belief, undoubtedly were made aware of and participated in numerous communications and discussions directly related to the safety and known adverse effects of products containing PPA

19. Members of the NDMA (including Defendants) and the NDMA's PPA Task Force had actual knowledge of the scientific community's concerns regarding PPA and of the numerous articles and reports of evidencing the association between PPA and strokes, arrhythmia, heart attack and death.

20. In 1994, members of the NDMA and the PPA Task Force, had direct knowledge of at least one manufacturer and distributor (Thompson Medical Company) of over-the-counter, non-prescription drugs containing PPA that reported several life threatening reactions to PPA and voluntarily added "black box" warning labels to its products which contained PPA Such products warned that: "There have been reports that stroke, seizure, heart attacks, arrhythmias, psychosis, and death might be associated with the ingestion of Phenylpropanolamine." Despite the feasibility and ease with which Defendants could have warned consumers about the dangers of Alka Seltzer Plus, Defendants failed to do so, and the consumers who purchased and/or ingested Alka Seltzer Plus were never warned or informed of these health dangers.

21. Defendants represented or impliedly represented that Alka Seltzer Plus was safe and did not pose a risk of stroke, seizure, heart attacks, arrhythmias, psychosis, and death.

22 The NDMA and the industry of which the Defendants were part, reviewed medical and scientific literature regarding products containing active ingredients such as PPA and participated in discussions concerning the safety of PPA Products, like those manufactured, sold and distributed by Defendants

23 Defendants and other members of NDMA, directly or indirectly, participated in the funding of purported studies on the safety of PPA, when they knew the inaccuracies and inadequacies of said studies

24. Defendants, in concert with other over-the-counter non-prescription drug manufacturers, thwarted the FDA from accurately and completely conducting full fact-finding studies on the safety of PPA

25. Pharmaceutical companies, such as Defendants, have a professional and ethical duty to inform and warn the public, especially those purchasing their products, of known adverse and dangerous side effects associated with their products or active ingredients in their products.

26 Life threatening adverse effects related to PPA leading to hospitalization and/or death have been well documented and known to pharmaceutical companies, including Defendants, for decades. These life threatening events have been documented through FDA warning/sentinel events systems, showing a large number of such events related to PPA. Several life threatening PPA injuries have been reported in Clin-Alert and other medical reports.

27. PPA manufacturer-sponsored research efforts on safety, of which Defendants either participated in and/or sponsored, lacked validity because the studies failed to systematically study the arrhythmogenic potential and known cardiac effects of PPA, or, until just before products containing PPA were withdrawn from the market, the potential neurological impact of PPA ingestion. Defendants failed to perform such studies despite the feasability and compelling medical justification to do so.

28. Defendants marketed Alka Seltzer Plus as safe and effective for these purposes However, Defendants did not perform adequate testing of Alka Seltzer Plus to ensure its safety. In fact, many reports indicated the active ingredient PPA was not safe.

29. Defendants' intended Alka Seltzer Plus to function as an over-the-counter cold, flu and allergy product. However, Alka Seltzer Plus was not sufficiently or properly tested prior to being marketed to the public or at any time while being marketed to the public. Testing of Alka Seltzer Plus's effects on the central nervous system or cardiovascular system was not performed over a reasonable period of time during the distribution and sale of Alka Seltzer Plus to the public. Nevertheless, Defendants represented Alka Seltzer Plus to be pharmaceutically tested and safe for consumption.

30. Defendants have concealed material facts, including the serious risks associated with ingesting PPA, from Plaintiff in product packaging, labeling, advertising, promotional campaigns and materials, among other ways, regarding the safety and use of products containing PPA.

**FIRST CAUSE OF ACTION**

(Strict Liability - Failure to Warn)

31. Plaintiff restates and realleges each allegation set forth in paragraphs 1 through 30 as it stated herein.

32. Products containing PPA were defective at the time of its manufacture, development, production, testing, inspection, endorsement, prescription, sale and distribution, in that, and not by way of limitation, said product and its warnings, instructions and directions failed to warn of the dangerous propensities of said product, which risks were known or should have been scientifically known to Defendants. Defendants, knew or should have known, of the defective condition, characteristics and risks associated with said product, as previously set forth herein.

33. At all times herein mentioned, the aforementioned product was defective, and Defendants, knew or should have known, that the product was to be used by the user without inspection for defects therein Moreover, Plaintiff neither knew, nor had reason to know, at the time

of the use of the subject product, of the existence of the aforementioned defects

34. As a direct and proximate result of the defective condition of the aforementioned product, Plaintiff died incurring damages in an amount that exceeds $75,000.00.

**SECOND CAUSE OF ACTION**

(Negligence)

35. Plaintiff restates and realleges each allegation set forth in paragraphs 1 through 35 as it stated herein.

36. At all times herein mentioned, Defendants had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, prepare for use, sell, prescribe and adequately warn of the risks and dangers of the aforementioned product.

37 At all times herein mentioned, Defendants negligently and carelessly manufactured, designed, formulated, compounded, produced, processed, assembled, inspected, distributed, marketed, labeled, packaged, prepared for use and sold the aforementioned product and failed to adequately test and warn of the risks and dangers of the aforementioned product

38. The Defendants impliedly or expressly represented that Alka Seltzer Plus was safe for use and would not cause the adverse health effects described herein.

39. As a direct and proximate result of said negligence and carelessness, Plaintiff died incurring damages in an amount that exceeds $75,000.00.

**THIRD CAUSE OF ACTION**

(Negligence Per Se)

40. Plaintiff restates and realleges each allegation set forth in paragraphs 1 through 39 as it stated herein.

41 At all times herein mentioned, Defendants had an obligation not to violate the law, in the manufacture, design, formulation, compounding, testing, production, processing, assembly, inspection, research, distribution, marketing, labeling, packaging, preparation for use, sale and warning of the risks and dangers of the aforementioned product.

42 At all times herein mentioned, Defendants violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C Section 301, et seq., related amendments and codes and federal regulations provided thereunder, the Sherman Food, Drug and Cosmetic Law, and other applicable laws, statutes and regulations

43. Plaintiff, as a purchaser and consumer of the product, is within the class of persons the statutes and regulations described above are designed to protect, and Plaintiff's injuries are the type of harm these statutes are designed to prevent

44. Defendants' acts constitute an adulteration and/or misbranding as defined by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 331, and constitutes a breach of duty subjecting defendants to civil liability for all damages arising therefrom, under theories of negligence per se

45. Defendants failed to meet the standard of care set by the following statutes and regulations, which were intended for the benefit of individuals such as Plaintiff, making Defendants negligent per se· (a) The labeling lacked adequate information on the use of the drug containing PPA [21 C F.R. Section 201.56(a) and (d)], (b) The labeling failed to provide adequate warnings of severe and disabling medical conditions including, without limitation: stroke, seizure, heart attacks, arrhythmias, psychosis, other adverse medical conditions and death as soon as there was reasonable evidence of their association with the drug [21 C F.R. 201.57(e)], (c) There was inadequate information for patients for the safe and effective use of Defendants' drug [C.F.R. 201.57(f)(2)]; (d) There was inadequate information regarding special care to be exercised by the doctor for safe and

effective use of Defendants' drugs [21 C.F R. 201 57(f)(1)]; and (e) The labeling was misleading and promotional [21 C.F.R. 201.56(b)].

46. As a direct and proximate result of the violations of the statutes described above, Plaintiff died incurring damages in an amount that exceeds $75,000.00.

**FOURTH CAUSE OF ACTION**

(Breach of Implied Warranty)

47. Plaintiff restates and realleges each allegation set forth in paragraphs 1 through 46 as it stated herein

48. Prior to the time that the aforementioned product was used by Plaintiff, Defendants impliedly warranted to Plaintiff that said product was of merchantable quality and safe and fit for the use for which it was intended

49. Plaintiff was unskilled in the research, design and manufacture of the aforementioned product and reasonably relied entirely on the skill, judgment and implied warranty of the Defendants in using the aforementioned product.

50 The aforementioned product was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that it had dangerous propensities when put to its intended use and would cause severe injuries to the user

51. As a direct and proximate result of the aforementioned breach of implied warranties by the Defendants, Plaintiff died incurring damages in an amount that exceeds $75,000.00.

**FIFTH CAUSE OF ACTION**

(Breach of Express Warranty)

52. Plaintiff restates and realleges each allegation set forth in paragraphs 1 through 51 as it stated herein

53. At all times herein mentioned, Defendants expressly warranted to Plaintiff, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that the aforementioned product was safe, effective, fit and proper for its intended use.

54 In utilizing the aforementioned product, Plaintiff relied on the skill, judgment, representations and foregoing express warranties of the Defendants. Said warranties and representations were false in that the aforementioned product was not safe and was unfit for the uses for which it was intended.

55. As a direct and proximate result of the foregoing breach of express warranties by the Defendants, Plaintiff died incurring damages in an amount that exceeds $75,000.00.

**SIXTH CAUSE OF ACTION**

(Deceit by Concealment)

56 Plaintiff restates and realleges each allegation set forth in paragraphs 1 through 55 as it stated herein

57 Defendants from the time that the aforementioned product was first manufactured, marketed and distributed, and up to the present, willfully deceived Plaintiff by concealing from the Plaintiff, Plaintiff's physicians and the general public, the true facts concerning said pharmaceutical product, which the Defendants, as manufacturers, marketers, and distributors of the product, had a duty to disclose.

58. At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of the aforementioned drug product and willfully deceived Plaintiff and the general public as to the health risks and consequences of the use of the aforementioned product.

Defendants were aware of the foregoing, and that the aforementioned product was not safe, fit and effective for human consumption, the use of said product is hazardous to health, and said product has serious propensity to cause serious injuries to users, including but not limited to death of Plaintiff as delineated herein

59. Defendants intentionally concealed and suppressed the true facts concerning said pharmaceutical product with the intent to defraud Plaintiff, in that the Defendants knew, or should have known, Plaintiff would not have used the subject product, if aware of the true facts concerning the dangers of said product

60. As a direct and proximate result of the foregoing fraudulent and deceitful conduct by Defendants, Plaintiff died incurring damages in an amount that exceeds $75,000.00.

**SEVENTH CAUSE OF ACTION**

(Negligent Misrepresentation)

61 Plaintiff restates and realleges each allegation set forth in paragraphs 1 through 60 as it stated herein.

62. Defendants from the time that the aforementioned product was first manufactured, marketed and distributed, and up to the present, made false misrepresentations, as previously set forth herein, to Plaintiff, including but not limited, to the misrepresentation that said pharmaceutical product, alone and in combination, was safe, fit and effective for human consumption At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of the aforementioned drug product and willfully deceived Plaintiff and the general public as to the health risks and consequences of the use of the aforementioned product.

63 The Defendants made the foregoing representations without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales

representatives and other authorized agents of said Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of the subject matter.

64. The foregoing representations by the Defendants were in fact false, in that the aforementioned product was not safe, fit and effective for human consumption, the use of said product is hazardous to health, and said product has a serious propensity to cause serious injuries to users, including but not limited to the death of Plaintiff as delineated herein.

65. The foregoing representations by Defendants were made with the intention of inducing reliance and the prescription, purchase and use of the subject product.

66 In reliance on Defendants' misrepresentations, Plaintiff was induced to purchase and use the use of the aforementioned product. If Plaintiff had known of the true facts and the facts concealed by Defendants, Plaintiff would not have used the subject product. The reliance of Plaintiff upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities who were in a position to know the true facts.

67. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff died incurring damages in an amount that exceeds $75,000.00

**EIGHTH CAUSE OF ACTION**

(Minnesota Deceptive Trade Practices Act § 325D *et seq.*)

68. Plaintiff restates and realleges each allegation set forth in paragraphs 1 through 67 as it stated herein.

69. Minn. Stat §§ 325D 13 and 325D.44 prohibit falsely advertising or representing the quality and/or ingredients of goods or merchandise sold in Minnesota.

70 Defendants engaged in acts and practices, as described in this Complaint, which

mislead the general public in violation of these consumer protection statutes. Defendants have advertised, marketed and sold this drug through the use of misleading, incomplete and deceptive advertising, promotion and product identification, in violation of the consumer protection statutes of this State.

71. At all times herein mentioned Defendants violated Minnesota's Deceptive Trade Practices Act by disseminating untrue and misleading statements and engaging in conduct likely to deceive consumers, by engaging in acts and practices with intent to induce Plaintiff to purchase Alka Seltzer Plus.

72. This conduct includes, but is not limited to, representing to Plaintiff that Alka Seltzer Plus, and all its ingredients, were safe, fit and effective for human consumption, knowing that said representations were false, and concealing from Plaintiff that said product had a serious propensity to cause injuries to users, and purposely downplaying and understating the health hazards and risks associated with this drug

73. The foregoing practices constitute false and misleading advertising, unlawful trade practices, and deceptive trade practices within the meaning of Minnesota's Deceptive Trade Act.

74 As a result of their conduct described above Defendants have been, and will be, unjustly enriched. Specifically, Defendants have been unjustly enriched by receipt of millions of dollars from the sale and prescription of said drugs, sold in large part as a result of the acts and omissions described herein.

75 Because of the fraudulent misrepresentations made by Defendants as detailed above, and the inherently unfair practice of committing a fraud against the public by misrepresenting and concealing material information, the acts of Defendants described herein constitute a deceptive trade practice.

76. As a direct and proximate result of Defendants' violation of Minnesota's Deceptive Trade Practices Act, Plaintiff died incurring damages in an amount that exceeds $75,000.00

**NINTH CAUSE OF ACTION**

(Minnesota Consumer Fraud Act § 325F. *et seq* )

77. Plaintiff restates and realleges each allegation set forth in paragraphs1 through 76 as it stated herein.

78. Minnesota Statute §§ 325F.67 and 325F.69 prohibit, false advertising and fraudulent business practices in the sale of goods in Minnesota.

79. At all times herein mentioned Defendants violated Minnesota's Consumer Fraud Act by disseminating untrue and misleading statements and engaging in conduct likely to deceive consumers, by engaging in acts and practices with intent to induce Plaintiff to purchase Alka Seltzer Plus.

80 This conduct includes, but is not limited to, representing to Plaintiff that Alka Seltzer Plus was safe, fit and effective for human consumption, knowing that said representations were false, and concealing from Plaintiff that said product had a serious propensity to cause injuries to users, and purposely downplaying and understating the health hazards and risks associated with this drug

81 The foregoing practices constitute false and misleading advertising, unlawful trade practices, and deceptive practices within the meaning of Minnesota's Consumer Fraud Act

82. As a result of their conduct described above Defendants have been and will be unjustly enriched. Specifically, Defendants have been unjustly enriched by receipt of millions of dollars from the sale and prescription of said drugs, sold in large part as a result of the acts and omissions described herein

83. Because of the fraudulent misrepresentations made by Defendants as detailed above,

and the inherently unfair practice of committing a fraud against the public by misrepresenting and concealing material information, the acts of Defendants described herein constitute a violation of Minnesota Consumer Protection Act.

84 As a direct and proximate result of Defendants' violation of Minnesota's Consumer Fraud Act, Plaintiff died incurring damages in an amount that exceeds $75,000.00.

WHEREFORE, Plaintiff requests judgment against Defendants, and each of them, as follows

1. Damages in an amount to compensate the Plaintiff's heirs for all damages including exemplary damages if applicable to which they are entitled by law;
2. For legal interest on all damages awarded from date of judicial demand until paid;
3. For attorneys's fees, including but not limited to fees specifically award under Minnesota's Consumer Fraud Statutes;
4. For an accounting and disgorgement of the profits Defendants enjoyed as a result of their illegal conduct,
5 For an order permanently enjoining Defendants' from selling products containing PPA;
6. For the costs of this litigation; and
7. For any other relief as this Court may deem equitable and just

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted this 11th day of Oct, 2001

ZIMMERMAN REED, P.L L.P.

Ronald S. Goldser - #35932
Timothy J. Becker - #256663

901 North Third Street
Suite 100
Minneapolis, Minnesota 55401
(612) 341-0400

Attorneys for Plaintiff

STATE OF MINNESOTA DISTRICT COURT

COUNTY OF HENNEPIN FOURTH JUDICIAL DISTRICT
CASE TYPE: WRONGFUL DEATH

FILED
01 OCT 10 PM 4:15
DEPUTY
DISTRICT COURT ADMINISTRATOR

In the Matter of the Appointment of a Trustee for the heirs of Victoria Trujillo, Decedent.

Court File No.

**ORDER APPOINTING TRUSTEE**

Based upon the Petition for Appointment of Trustee and Oath of Petitioner for an order of formal appointment of Patricia Ann Medina as trustee, the undesigned Judge having heard and considered such Petition, being fully advised in the premises,

IT IS HEREBY ORDERED THAT, Patricia Ann Medina be appointed trustee to maintain the action described in said Petition and that no bond be posted.

Dated: 10/10/01

BY THE COURT

JEANNE J. GRAHAM
JUDGE OF DISTRICT COURT
Judge of District Court