# U. S. District Court

## Western District of Washington

Seattle: 206-553-1590 Tacoma: 253-593-6313

| | | | |
|---|---|---|---|
| TO: | D Joseph Hurson | | |
| FAX: | 223-7107 | | |
| SENT ON: | 06/18/03 | 06:03 PM | |
| RE Case No: | 2:01-md-01407 | Docket No: | 00001892 |
| PAGES: | 41 | | |

I hereby certify that the attached document is a true and correct copy of the original on file in my office.

ATTEST: Bruce Rifkin, Clerk, U. S. District Court

If this fax is incomplete or cannot be delivered as addressed, please call Shirley Lindberg or Nealann Skari at 206-553-4170.

FILED ENTERED
LODGED RECEIVED

JUN 18 2003

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY DEPUTY

cc: counsel: KJK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE: PHENYLPROPANOLAMINE (PPA) PRODUCTS LIABILITY LITIGATION,

This document relates to all actions

MDL NO. 1407

ORDER GRANTING IN PART AND DENYING IN PART MDL DEFENDANTS' MOTION TO PRECLUDE PLAINTIFFS' EXPERT OPINIONS AS TO GENERAL CAUSATION PURSUANT TO FED. R. EVID. 702 AND 703 AND DAUBERT

## I. INTRODUCTION

Defendants in this multi-district litigation filed a motion to preclude plaintiffs' expert opinions as to general causation pursuant to Federal Rules of Evidence 702 and 703 and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). Having reviewed pleadings filed in support of and in opposition to the motion, along with the remainder of the record, and having heard oral argument and expert testimony, and, being fully advised, the court finds and concludes as follows:

## II. BACKGROUND

### A. Regulatory History of PPA

Phenylpropanolamine ("PPA") was first synthesized in the early 1900s. As a sympathomimetic drug, PPA mimics aspects of



MD 01-0140 #00001892

1892

the sympathetic nervous system. By the 1970s, PPA was widely used in over-the-counter ("OTC") and prescription cough and cold and appetite suppressant products.

Because its commercial use predated the Food and Drug Administration's ("FDA") adoption of rules and procedures governing the sale of OTC products, the FDA "grandfathered" PPA into the system. Pursuant to a monograph review process initiated in 1972, the FDA intended to categorize PPA and other grandfathered drugs as either "generally recognized," "not generally recognized," or "insufficient data to permit classification" - as safe and effective. The FDA allowed grandfathered drugs to remain on the market until a final rule issued.

In 1976, an FDA advisory review panel recommended the categorization of PPA-containing cough and cold products as generally recognized as safe and effective. A similar recommendation for PPA-containing appetite suppressant products followed in 1982. However, despite ongoing consideration of the safety of these products, the FDA never formally categorized PPA.

B. Reports and Studies Addressing Safety of PPA

1. Early Reports and Studies:

From the 1970s on, case reports, case series, and medical literature addressed adverse effects purportedly associated with PPA. Beginning in 1979, more than thirty published case reports described the occurrence of hemorrhagic stroke following the ingestion of PPA. Many of these reports involved adolescent girls and women utilizing PPA-containing appetite suppressants.

Also, some animal studies and human clinical trials demonstrated sudden increases in blood pressure in response to PPA.

2. Early Epidemiological Studies:

A 1984 epidemiological study examined the occurrence of cerebral hemorrhage in patients filling a PPA prescription. The "Jick study," the results of which were published in a letter to the editor, did not find a significant association between PPA and hemorrhage stroke. The "O'Neill and Van de Carr study," an unpublished study also conducted in the mid-1980s, reached a similar conclusion based on analysis of computer profiles in two states' medicaid databases.

3. Review of FDA's Spontaneous Reporting System:

In 1991, Dr. Heidi Jolson, an FDA epidemiologist, reviewed the FDA's Spontaneous Reporting System ("SRS") database for cerebrovascular accidents and hypertensive episodes reported in association with PPA ingestion. Jolson found that, between 1969 and 1991, the FDA received twenty-nine spontaneous reports of cerebrovascular accidents associated with PPA, twenty-two of which involved hemorrhagic stroke associated with PPA in appetite suppressants (16 cases) and cough and cold products (6 cases). She found the data suggested that PPA-containing diet pills increase the risk of cerebrovascular accidents.

4. The Yale Hemorrhagic Stroke Project:

Following Dr. Jolson's SRS study, the Nonprescription Drug Manufacturers Association ("NDMA") and several drug manufacturers initiated discussions with scientists from Yale University

regarding an epidemiological study investigating links between PPA and hemorrhagic stroke. In 1992, the FDA, NDMA, Yale scientists, and two PPA product manufacturers who agreed to sponsor the study collaborated in the design of the Hemorrhagic Stroke Project ("HSP"). A Scientific Advisory Group ("SAG") operated autonomously from the investigators and sponsors to provide general oversight throughout the study. In 1994, all involved entities approved the study protocol.

As a "case-control" study, the HSP sought to compare PPA exposure in individuals who suffered hemorrhagic strokes (the "cases") and those who did not suffer hemorrhagic strokes (the "controls"). The study limited itself to men and women between the ages of eighteen and forty-nine.

The HSP aimed to estimate: (1) among men and women, the association between "any use" of PPA and hemorrhagic stroke; (2) among men and women, the association between PPA and hemorrhagic stroke by type of exposure (cough/cold or appetite suppression); and (3) among women (a) the association between "first use" of PPA and hemorrhagic stroke and (b) the association between PPA in appetite suppressants and hemorrhagic stroke. "Any use" included use within the three days preceding the "focal time," defined as the onset of symptoms plausibly related to the stroke and causing the patient to seek medical attention. "First use" meant that an individual consumed the product within twenty-four hours before the focal time, with no other use in the preceding two weeks.

The HSP issued its final report in May 2000. The HSP

investigators construed the results of the study to suggest that PPA increases the risk of hemorrhagic stroke. Among other findings, the investigators found that, for women, the use of a PPA-containing appetite suppressant was associated with an increased risk of hemorrhagic stroke (16.58 odds ratio, lower limit of one-sided 95% confidence interval ("LCL") = 2.22, p-value = 0.011).[1] The investigators also found a suggestion of an association in women with any first use of PPA, all of which involved cough or cold products (3.13 odds ratio, LCL = 1.05, p-value = 0.042). Because no men reported use of appetite suppressants and only two reported first use of a PPA-containing product, the investigators could not determine whether PPA posed an increased risk for hemorrhagic stroke in men.

C. <u>Withdrawal of PPA from the Market</u>

In October 2000, the FDA convened a meeting of the Non-prescription Drug Advisory Committee ("NDAC") to consider the impact of the HSP. The NDAC recommended that PPA-containing products no longer be available for OTC use.

On November 6, 2000, the FDA requested voluntary removal of PPA-containing products from the market and issued a public health advisory. Entities responsible for manufacturing and marketing these products withdrew them from the market. In

---

[1] The odds ratio reflects the odds that a case was exposed to the odds that a control was exposed. P-values measure the probability that the reported association was due to chance, while confidence intervals indicate the range of values within which the true odds ratio is likely to fall.

December 2000, the New England Journal of Medicine ("NEJM") published the HSP results in a lead article. See Walter N. Kernan et al., Phenylpropanolamine and the Risk of Hemorrhagic Stroke, 343 New Eng. J. Med. 1826 (2000) (hereinafter "NEJM Article").

## III. DISCUSSION

Plaintiffs' Steering Committee ("PSC") proffer fourteen experts endorsing their general causation theory, including experts in pharmacology, epidemiology, neurology, toxicology, and pediatrics.[2] Defendants challenge the reliability of all of plaintiffs' general causation expert opinions. They assert the inadmissibility of these opinions to support a conclusion that PPA can cause hemorrhagic stroke, ischemic stroke, cardiac injuries, or, to the extent claims of this nature may exist, seizures or psychoses. Defendants also focus on the parameters

---

[2] The PSC-identified experts include: Dr. Jerome Avorn; Dr Rubin Richard Clapp; Dr. Robert A. Egan; Dr. Edward Feldmann; Dr. Steven J. Kittner; Dr. Raymond C. Lake; Dr. James R. McDowell; Dr. Walter Molofsky; Dr Paul R. Pentel; Dr. George Ricaurte; Dr. Stanley Turhim; Dr. Alan Woolf; and Dr. Gary P. Zaloga. Also, although not originally designated as a PSC witness, the court allowed Dr. Steven R. Levine to testify as to ischemic stroke injuries. Individual plaintiffs also offer additional experts in accordance with an order allowing designation of additional general causation experts so long as their "opinions, evidence and/or theories have not previously been determined by the Court to be scientifically unreliable or otherwise inadmissible." Stip. and Order Re: Expert Disclosures at 2 (Sept. 9, 2002). As this order will control the scope of general causation testimony permitted by any expert witness offered in any federal PPA litigation, the court denies the motion, filed on behalf of certain plaintiffs, to deem the Daubert objections waived as to Dr. Donald Marks.

and results of the HSP, arguing that the study lacks reliability as to certain "sub-populations," including men, individuals below age eighteen and above age forty-nine, and individuals suffering strokes more than three days after ingestion of PPA.

A. The Daubert Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Pursuant to this rule, a witness qualified as an expert in "scientific . . . knowledge" may testify thereto if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

As established by the Supreme Court in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), a trial court acts as a "gatekeeper" to the admission of expert scientific testimony under Rule 702. The court must conduct a preliminary assessment to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. at 589. This two-step assessment requires consideration of whether (1) the reasoning or methodology underlying the testimony is scientifically valid (the "reliability" prong); and (2) whether that reasoning or methodology properly can be applied to the facts in issue (the "relevancy" prong). Id. at 592-93; Kennedy v. Collagen Corp., 161 F.3d 1226, 1228 (9th Cir. 1998).

Reliable testimony must reflect "scientific knowledge" - implying a "grounding in the methods and procedures of sci-

ence[,]" and signifying something beyond "subjective belief or unsupported speculation." Daubert, 509 U.S. at 590. The inferences or assertions drawn by the expert must be "derived by the scientific method." Id. In essence, the court must determine whether the expert's work product amounts to "'good science.'" Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995) ("Daubert II") (quoting Daubert, 509 U.S. at 593) The relevancy, or "fit," prong requires that the testimony be "'relevant to the task at hand,' . . . i.e., that it logically advances a material aspect of the proposing party's case." Id. (quoting Daubert, 509 U.S. at 597).[3]

In Daubert, the Supreme Court outlined factors relevant to the reliability prong, including: (1) whether the theory can be and has been tested; (2) whether it has been subjected to peer review; (3) the known or potential rate of error; and (4) whether the theory or methodology employed is generally accepted in the relevant scientific community. 509 U S. at 593-94. The Court emphasized the "flexible" nature of this inquiry. Id. at 594. As later confirmed in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-42 (1999): "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad

---

[3] Defendants appear to focus exclusively on Daubert's reliability prong. Given that each of plaintiffs' expert opinions would assist the trier of fact in reaching a conclusion as to general causation, the court finds the relevancy prong of Daubert satisfied. See, e.g., Kennedy, 161 F.3d at 1230.

latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." Accord Daubert II, 43 F.3d at 1317 ("[W]e read the Supreme Court as instructing us to determine whether the analysis undergirding the experts' testimony falls within the range of accepted standards governing how scientists conduct their research and reach their conclusions.")

The Daubert analysis focuses on the principles and methodology underlying an expert's testimony, not on the expert's conclusions. 509 U.S. at 595. However, the Supreme Court later cautioned that "conclusions and methodology are not entirely distinct from one another." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). As such, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Id. (finding nothing in either Daubert or the Federal Rules of Evidence requiring the admission of opinion evidence connected to existing data "only by the *ipse dixit* of the expert.")

Upon remand of Daubert, the Ninth Circuit added that expert testimony "based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions[] expresse[d] were 'derived by the scientific method.'" Daubert II, 43 F.3d at 1317. Where not based on independent research, the testimony must be supported by objective, verifiable evidence that it rests on scientifically valid principles, such as peer review and publication in a

reputable scientific journal. Id. at 1317-18. In the absence of independent research or peer review, experts must explain the process by which they reached their conclusions and identify some type of objective source demonstrating their adherence to the scientific method. Id. at 1318-19; Domingo v. T.K., 289 F.3d 600, 605-06 (9th Cir. 2002).

B. Defendants' Daubert Challenges

1. Seizures, Psychoses, and Injuries Occurring More than Three Days After Ingestion of PPA:

The court held a one-day informational hearing in which the parties presented their arguments on defendants' motion. Following that hearing, the court issued preliminary rulings, narrowing the scope of the subsequent Daubert hearings. See Prelim. Ruling on Defs.' Mot. to Preclude Pls.' Ex. Op's (Apr. 4, 2003); Order Re: Apr. 7, 2003 Status Conf. (Apr. 8, 2003).

The court found insufficient basis to support expert testimony as to injuries occurring more than three days after ingestion of PPA. All of the evidence and expert opinions proffered support the HSP's three day window and plaintiffs did not inform the court of an injury occurring outside that time frame.[4] The court finds the lack of supportive scientific evidence and testimony dispositive.

The court also concluded that plaintiffs offered no scientific basis for admitting expert opinions on seizures or psycho-

[4] All plaintiffs were on notice that the court would consider this and all of defendants' other Daubert challenges.

ses attributed to PPA. Again, no plaintiff pursued such a claim. Also, the few expert opinions proffered with respect to these injuries were no more than conclusory. Given the dearth of supportive evidence, the court finds any opinions as to these injuries scientifically unreliable.[5]

2. <u>Hemorrhagic Stroke in Women Between the Ages of Eighteen and Forty-Nine</u>:

Hemorrhagic stroke results from the rupturing of a blood vessel in the brain. The hemorrhage may be either intracerebral (within the brain itself) or subarachnoid (within the fluid-filled space surrounding the brain) (hereinafter "ICH" and "SAH" respectively). Approximately fifteen to twenty percent of strokes fall into the hemorrhagic category.

In supporting general causation between PPA and hemorrhagic stroke, plaintiffs' experts base their opinions on several lines of evidence, including: (1) the HSP; (2) the biological plausibility for PPA to cause stroke, including evidence that PPA causes (a) narrowing of cerebral blood vessels; (b) sudden spikes in blood pressure; and (c) "beading" of arteries in the brain (including the similarity of PPA to other drugs in the same class known to have the same effect); (3) animal studies, (4) human clinical studies; (5) case reports and case series; (6) medical textbooks and other treatises; and (7) the SRS study.

---

[5] For the reasons described below, the court also issued a preliminary ruling finding admissible the expert testimony based on the HSP and related to hemorrhagic stroke in women from age eighteen and above.

a. <u>The HSP</u>:

The HSP found an association between PPA and hemorrhagic stroke in women between the ages of eighteen and forty-nine. Defendants describe the HSP investigators' use of a one-tailed statistical analysis[6] as unconventional, and identify numerous perceived flaws, many of which they maintain were unknown to the FDA and/or NEJM.[7] They identify the finding relating to women and appetite suppressants as the only statistically significant result after peer review, and note that even that number resulted from a mere six cases in comparison to one control. Defendants maintain the insufficiency of a "suggestion of an association" for first use/cough and cold products in women, and note that this finding similarly rests on small numbers, including no more than seven cases and four controls.

Courts frequently depend on epidemiologic studies in determining the reliability of expert testimony. <u>See</u> 2 <u>Modern Scientific Evidence: The Law and Science of Expert Testimony</u> § 28-1.1, at 302-03 (David L. Faigman et al. eds., 1997) ("Epidemiologic studies have been well received by courts trying mass tort suits. Well-conducted studies are uniformly admitted. The widespread

---

[6] A one-tailed test looks only to whether an agent increases the risk, while a two-tailed test also looks to whether an agent protects against the risk.

[7] Those flaws include fragile data, improper use of random digit dialing, low participation by eligible controls, chance, temporal precedence bias, misclassification bias, selection bias, inadequate adjustments for confounding, the combination of ICH and SAH, and various protocol violations and errors.

acceptance of epidemiology is based in large part on the belief that the general techniques are valid.") See also Daubert, 509 U.S. at 593 ("Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested.") Despite the many and varied concerns raised by defendants in regard to the HSP, the court finds, pursuant to Daubert, testimony relying on this study reliable, especially when taken in conjunction with the additional lines of evidence addressed below.

Significantly, the HSP grew out of pre-litigation research and was subjected to peer review. Daubert II, 43 F.3d at 1318 ("Establishing that an expert's proffered testimony grows out of pre-litigation research or that the expert's research has been subjected to peer review are the two principal ways the proponent of expert testimony can show that the evidence satisfies the first prong of Rule 702.") Plaintiffs' roster of experts include a co-investigator/co-author of the HSP, as well as a participant in the October 2000 FDA NDAC meeting convened to consider the impact of the study. See Defs.' Exs. A-5 and A-6 (expert reports of Drs. Edward Feldmann and Steven J. Kittner). The prestigious NEJM published the HSP results, further substantiating that the research bears the indicia of good science. See Daubert II, 43 F.3d at 1318 ("That the research is accepted for publication in a reputable scientific journal after being subjected to the usual rigors of peer review is a significant indication that it is

taken seriously by other scientists, i.e., that it meets at least the minimal criteria of good science.") (citing Daubert, 509 U.S. at 593 ("[S]crutiny of the scientific community is a component of 'good science[.]'"))

Even prior to submission to the NEJM, the HSP underwent multiple layers of review. In addition to the FDA and the autonomous SAG, the HSP involved, from its inception, both the NDMA and two defendant-manufacturers. This involvement included approval of the investigators selected, the SAG members, and the study protocol, as well as an opportunity to challenge the study.

In fact, in reviewing the study and industry criticisms, the FDA considered many of the same challenges raised here. In rejecting these criticisms, the FDA epidemiologic and statistical reviewers found the study "well designed and executed." See FDA Epid. Rev. (Sept. 27, 2000), Pls.' Ex. D-9 at 1, 9; accord FDA Stat. Rev. (Sept. 26, 2000), Pls.' Ex. D-8 at 16.[8] The epidemiologists found the study's strengths to include: "the clarity of its objectives, the meticulous adherence to sound epidemiology practices in its design and execution, and the consistency of the findings, regardless of the analytic methods." See FDA Epid. Rev. at 9. Indeed, far from finding the study

---

[8] The reviewers considered, inter alia, selection bias, temporal precedence bias, misclassification bias, small sample size and recruitment of controls, confounding, statistical methodology, and "sparse data" bias. In rejecting these concerns, the reviewers found that "[a]ll reasonable steps were taken to minimize bias and confounding." See FDA Epid. Rev. at 1.

flawed, the FDA's statistician found the HSP "one of the best planned, conducted and most thoroughly analyzed studies reviewed in the last ten years." See FDA Stat. Rev. at 16.

Defendants' ex post facto dissection of the HSP fails to undermine its reliability. Scientific studies almost invariably contain flaws. See Federal Judicial Center, Reference Manual on Scientific Evidence 337 (2d ed. 2000) (hereinafter "Ref. Manual") ("It is important to recognize that most studies have flaws. Some flaws are inevitable given the limits of technology and resources.") See also In re Orthopedic Bone Screw Prods. Liab. Litig., MDL No. 1014, 1997 U.S. Dist. LEXIS 6441, at *26-28 (E.D. Pa. May 5, 1997) ("[T]here is no such thing as a perfect epidemiological study."; despite weaknesses, court found study sufficiently reliable to be admissible) When faced with epidemiological evidence, the court must determine whether the flaws compromise the study's findings. See Ref. Manual at 337.

Upon close examination of the arguments and supporting evidence, the court finds the HSP's "flaws" (including any unknown to the FDA and/or NEJM) either inaccurately identified as flaws or inconsequential to the reliability of the study as a whole. The HSP investigators utilized widely accepted and reliable scientific and epidemiological procedures in conducting this study. Because the court finds the methodology scientifically sound, any flaws that might exist go to the weight afforded the HSP, not its admissibility. See Kennedy, 161 F.3d at 1230-31 (so long as the court finds the expert's reasoning scientific and

useful to the jury, opposing opinions and evidence go to the weight afforded an expert's opinion, not to admissibility). See also Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1188 (9th Cir. 2002) ("[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility. Vigorous cross-examination of a study's inadequacies allows the jury to appropriately weigh the alleged defects and reduces the possibility of prejudice.") (internal citation omitted), cert. denied, ___ U.S. ___, 123 S.Ct. 854 (2003).

The court finds similarly unavailing defendants' arguments as to the significance of the various HSP results and the small numbers upon which they are based. Defendants warn of the consequences of "data fragility," in that small errors or adjustments can implicate dramatically different results. Yet, despite the small numbers, the investigators concluded: "Our study provides strong epidemiological evidence of the association between the use of [PPA] and the risk of hemorrhagic stroke." NEJM Article at 1831. Moreover, after conducting three sensitivity analyses because of the "sparse data," the FDA epidemiologists found the association for both appetite suppressants and first use of cough and cold products remained. See FDA Epid. Rev. at 8-9. Because the court finds the methodology reliable, the mere fact that the findings resulted from small numbers does not impact the study's admissibility.

That the finding as to cough and cold products reported in

the NEJM was not statistically significant by "conventional criteria" also does not detract from the reliability of the study. See NEJM Article at 1831 (maintaining that the finding nonetheless "arouse[d] concern regarding safety.") The HSP's one-tailed test looked only to whether PPA increases the hemorrhagic stroke risk, while a two-tailed test also looks to whether an agent protects against the risk. In order to comply with NEJM publication requirements, two-sided results were presented in the published article, altering the p-values and associated confidence intervals assigned to the results. Despite this alteration for publication purposes, the HSP final report "demonstrated a statistically significant increased risk of hemorrhagic stroke among both appetite suppressant users and first time users of PPA as a cough/cold remedy." FDA Epid. Rev. at 1-2, 10 (finding the HSP result relating to first use of cough and cold remedies to be as important as the appetite suppressant finding). The court finds that the HSP's one-tailed statistical analysis complies with proper scientific methodology, and concludes that the difference in the expression of the HSP's findings falls far short of impugning the study's reliability. See Ref. Manual at 126-27, 358 n.69 ("Since most investigators of toxic substances are only interested in whether the agent increases the incidence of disease (as distinguished from providing protection from the disease), a one-tailed test is often viewed as appropriate."; "a rigid rule [requiring a two-tailed test] is not required if p-values and significance levels are used as clues rather than as

mechanical rules for statistical proof.")[9]

Finally, the HSP investigators and plaintiffs' witnesses accurately noted the limitations of the previous epidemiological studies on PPA. For example, the Jick study did not consider OTC medication and allowed for a thirty-day interval between the time a patient filled a prescription and suffered a stroke. The court finds that, given these and other limitations, both the Jick and the unpublished O'Neill and Van de Carr study carry little weight in comparison to the HSP. See FDA Stat. Rev. at 5 ("Because of bias involved with the earlier studies, the findings of th[e] carefully planned and conducted [HSP] should be given greater weight as confirmatory safety evidence[.]")

For all of these reasons, the court finds the HSP scientifically reliable evidence upon which to base expert opinion and, therefore, evidence that should not be excluded.

b. Non-Epidemiological Lines of Evidence:

Plaintiffs' experts supplement the HSP results with non-epidemiological lines of evidence, including case reports, textbooks and treatises, adverse drug reports, animal studies, and drug analogies. In response, defendants cite to numerous

---

[9] All parties involved in designing the HSP were interested solely in testing whether PPA increased the risk of stroke. See Dep. of HSP Investigator Ralph Horowitz, Defs.' Ex. E-7 at 25-27. Cf. Good v. Fluor Daniel Corp., 222 F. Supp. 2d 1236, 1242-43 (E.D. Wash. 2002) (finding one-sided method inappropriate where that analysis assumed the very fact in dispute, that is, whether there was any exposure to radiation in excess of limits established by federal regulation).

decisions describing the limitations of this non-epidemiological evidence.[10]

Defendants isolate these sources, rather than considering the whole. Non-epidemiological sources are frequently utilized by experts in rendering scientific opinions and, under Daubert, should be considered by the court in assessing the reliability of those opinions. See, e.g., Kennedy, 161 F.3d at 1228-31 (finding trial court abused its discretion by excluding expert testimony based on, inter alia, peer-reviewed articles, clinical trials and product studies conducted by the manufacturer, and a state health department's review of reported cases of adverse reactions); Hopkins v. Dow Corning Corp., 33 F.3d 1116, 1124-25 (9th Cir. 1994) (upholding trial court's admission of expert testimony based on, inter alia, clinical experience and studies, medical literature, and general scientific knowledge about drug's properties established by animal studies and biophysical data).

In considering the non-epidemiological evidence relied upon by plaintiffs' experts, the court finds significant the sheer

---

[10] See, e.g., Schudel v. General Electric, 120 F.3d 991, 996-97 (9th Cir. 1997) (noting testimony that small differences in molecular structure of different agents often have significant consequences); Glastetter v. Novartis Pharms. Corp., 252 F.3d 986, 989-90 (8th Cir. 2001) (stating that case reports are not scientifically valid proof of causation); Glastetter v. Novartis Pharms. Corp., 107 F. Supp. 2d 1015, 1034 & n.18 (E.D Mo. 2000) (finding textbook and treatise conclusions no more reliable than the case reports on which they were based); Sanderson v. Int'l Flavors and Fragrances, Inc., 950 F. Supp. 981, 997 (C.D. Cal. 1996) (a party proffering animal studies must provide good grounds for extrapolating from animals to humans).

volume of case reports, case series, and spontaneous reports associating PPA with hemorrhagic stroke in women. See, e.g., Rider v. Sandoz Pharms. Corp., 295 F.3d 1194, 1202 (11th Cir. 2002) (noting that the district court identified the types of evidence that would have been considered reliable, including, inter alia, "a very large number of case reports.") While not conclusive, the multitude of textbooks and treatises including PPA as a risk factor for stroke adds to the reliability of plaintiffs' experts' opinions.[11] See Daubert, 509 U.S. at 594 ("Widespread acceptance can be an important factor in ruling particular evidence admissible[.]") The non-epidemiological evidence also gains added legitimacy from the fact that several of plaintiffs' experts base their opinions, in part, on independent PPA-related research. See Daubert II, 43 F.3d at 1317.[12]

[11] Plaintiffs list over a dozen medical textbooks associating PPA with high blood pressure and stroke. See, e.g., John C.M. Brust, Stroke and Substance Abuse, in Uncommon Causes of Stroke 132, 133 (Julian Bogousslavsky & Louis R. Caplan eds., 2001); The Little Black Book of Neurology 170-72 (Bonner, James S. & Jo Jaeger Bonner eds. 2d ed., 1991).

[12] Drs. Pentel, Zaloga, and Lake conducted human clinical and animal studies on PPA See also Glaser v. Thompson Med. Co., 32 F.3d 969, 972-75 (6th Cir. 1994) (finding scientifically reliable Dr. Zaloga's opinion that PPA-containing Dexatrim can cause severe hypertension). The remaining PSC-identified experts base their opinions on their clinical experience and training, review of the documents and literature, and/or studies and publications on stroke and other toxic substances. For each, the court has "plumbed the depths" between their citations and conclusions and found their opinions sufficiently grounded in the scientific method. See Metabolife Intern., Inc. v. Wornick, 264 F.3d 832, 845 (9th Cir. 2001).

Taking into consideration all of the lines of evidence upon which plaintiffs' experts rely, including the HSP, expert opinions associating PPA with hemorrhagic stroke in women above the age of eighteen and below the age of forty-nine clearly satisfy Daubert's reliability prong.[13]

c. Recent Article on Aneurysmal SAH:

During the final day of the Daubert proceedings, defendants raised challenges relating to a new article by the HSP investigators to be published in the June 2003 issue of the journal "Stroke." See Joseph P. Broderick et al., Major Risk Factors for Aneurysmal Subarachnoid Hemorrhage in the Young are Modifiable, Stroke (2003) (hereinafter "Stroke Article"). Defendants assert that this article demonstrates the lack of an association between PPA and SAHs resulting from the rupture of an aneurysm ("aneurysmal SAH"). The court finds that defendants distort and misinterpret the Stroke Article.

The HSP investigators structured the HSP to study hemorrhagic stroke as a single entity. They did not collect enough data or enroll enough subjects to study PPA in relation to SAH or ICH, let alone a particular type of SAH or ICH.[14] In the Stroke

---

[13] The court does not find discussion of the so-called "Bradford Hill" criteria, sometimes utilized by scientists in considering questions of causation, necessary or helpful.

[14] All entities involved in designing the HSP approved the joint consideration of ICH and SAH in approving the design of the study. Moreover, both scientific literature and other studies, including the Jick study, support consideration of hemorrhagic stroke as a single entity.

Article, the HSP investigators look at the HSP data to identify general risk factors for aneurysmal SAH - a subset of a subset of hemorrhagic stroke. They do not proffer a new epidemiological study on PPA and aneurysmal SAH. Instead, they include in a table, without any corresponding substantive discussion, an odds ratio (1.15) and p-value (0.87) for PPA in relation to aneurysmal stroke.

Contrary to defendants' assertion, the PPA odds ratio reported in the Stroke Article, standing alone, is not inconsistent with the results of the HSP. The article reports a single PPA index for "any use" of PPA. The resulting 1.15 odds ratio does not differ significantly from the HSP's 1.49 odds ratio for any use of PPA. The article does not look at "first use" of PPA or PPA use in connection with appetite suppression - the two most significant findings of the HSP (3.13 and 16.58 odds ratios respectively) and the two findings upon which plaintiffs' experts primarily based their opinions.

Nor does the associated p-value identified for any use of PPA demonstrate the lack of an association. Defendants point to the 0.87 p-value as indicating that the difference between the 1.15 odds ratio and the 1.00 null hypothesis value (i.e., no true association between PPA and stroke) is attributable to chance alone. However, plaintiffs' expert, Dr. Kenneth Rothman, explained that a p-value cannot provide evidence of lack of an effect. <u>See</u> Rothman Aff., ¶ 7; Kenneth J. Rothman, <u>Epidemiology, An Introduction</u> at 117 (Oxford Univ. Press 2002). Dr. Rothman

clarified that statistical reassurance as to lack of an effect would require an upper bound of a reasonable confidence interval close to the null value. See Rothman Aff., ¶ 7. Calculating a 95% confidence interval with a lower bound of 0.5 and an upper bound of 2 6, Dr. Rothman concluded that the data does not provide reassurance about the absence of an association. Id at ¶ 8.

For all of these reasons, the court finds nothing in the Stroke Article undermining the admissibility of plaintiffs' expert opinions associating PPA with aneurysmal SAH.[15]

3. Hemorrhagic Stroke in the Various "Sub-Populations":

The HSP focused on men and women between the ages of eighteen and forty-nine. It did not offer any conclusions as to individuals outside of that age range, and the results were inconclusive as to men. The lack of epidemiological evidence directly associated with men, children, and individuals above the age of forty-nine is not fatal under Daubert. See, e.g., Ken-

[15] The court also finds defendants' purported surprise at their May 2003 discovery of the Stroke Article disingenuous. Defendants fail to mention that several of their experts were present for a February 2003 American Stroke Association meeting at which the abstract for the article and the data were presented. See Feldmann Aff., ¶ 3. The court similarly rejects defendants' accusation that Dr. Feldmann denied knowledge of the analysis underlying the Stroke Article in his November 2002 deposition. A full reading of Dr. Feldmann's testimony exposes no such subterfuge. Given that defendants have since extensively questioned Dr. Feldmann under oath about the article, and given the above-described conclusion as to the article's lack of significance, the court denies defendants' request for additional discovery on this subject.

nedy, 161 F.3d at 1229-30. See also In re Berg Litig., 293 F.3d 1127, 1130 (9th Cir. 2002). As discussed below, plaintiffs' experts demonstrate that it is scientifically acceptable to extrapolate the conclusions of the HSP to these sub-populations.

a. Hemorrhagic stroke in individuals above the age of forty-nine:

Defendants generally dispute whether extrapolation to a different age group is good science. However, in arguing against extrapolation to individuals above the age of forty-nine, defendants' experts primarily point to the fact that the risk of stroke increases as age increases. The court sees no reason why the increasing risk of stroke would render the HSP and the non-epidemiolcgical lines of evidence unreliable as applied to this age group. See Dep. of Dr. Jerome Avorn, Defs.' Ex. E-1 at 363 ("[A]ll of the evidence we have is that risks only go up in the elderly. . . . [T]here are no drugs I'm aware of that get safer the older you get.") As such, the court finds testimony associating PPA with hemorrhagic stroke in individuals above the age of forty-nine reliable and, thus, admissible under Daubert.

b. Hemorrhagic stroke in children and men:

Defendants accurately note that, in addition to the absence of supportive epidemiological evidence, plaintiffs rely on a smaller number of case reports directly relating to children and men. Also, in disputing the propriety of extrapolating evidence from women to men, and from adults to children, defendants and their experts go to great lengths to highlight differences

between these sub-populations.

Plaintiffs' experts assert that the weight of the evidence, including that obtained through extrapolation, supports the opinion that PPA can cause stroke in children and men.[16] The court must address whether this extrapolation constitutes good science See, e.g., Domingo, 289 F.3d at 606 ("[S]tudies involving similar but not identical situations may be helpful, [so long as] an expert [] set[s] forth the steps used to reach the conclusion that the research is applicable.")

It is axiomatic that children differ from adults in various ways, just as younger children differ from older children, and younger adults differ from the elderly. Men and women, likewise, differ in some respects. As might be expected, the incidence rates of stroke, types of stroke, and some of the risk factors for stroke vary between these groups. Plaintiffs' experts concede these differences, but maintain that these sub-populations share far more similarities than differences. After considering all possible differences, plaintiffs' experts find no basis for concluding that PPA poses a risk exclusive to adult females.[17]

---

[16] In proffering evidence directly relevant to these sub-populations, plaintiffs point to most of the same non-epidemiological types of evidence discussed above, including, inter alia, case reports, textbooks and other medical literature, and biological plausibility arguments

[17] Similarly, the FDA did not differentiate between men and women, and found no reason to believe the risks posed by PPA were limited to individuals within the age range studied in the HSP.

Because of the many barriers to including children in studies, scientists and medical practitioners routinely extrapolate study results and data on adults to children. This practice, despite its limitations, finds wide support in reputable sources. See, e.g., Robert M. Ward, Adverse Effects of Drugs in the Newborn, in Rudolph's Pediatrics 146 (Colin D. Rudolph et al. eds. 21st ed., 2001) ("Children continue to be excluded from studies of most new drugs, so that drug therapy of those patients is seldom guided by large controlled trials."); George C. Rodgers, Jr. & Nancy J. Matyunas, Oski's Pediatrics 61-62 (Julia A. McMillan et al. eds. 3d ed., 1999) ("In the absence of controlled, randomized clinical trials in children, pediatricians must either extrapolate information from adult studies or use uncontrolled reports of clinical experience in children, both of which have major flaws.")[18] Plaintiffs' experts also point to the presumption in pediatric toxicology that toxic effects seen in adults will be as great, if not greater, in children. See Michael J. Rieder, Adverse Drug Reactions in Neonates, Infants,

---

See FDA Proposal to Withdraw Approval of New Drug Applications, 66 Fed. Reg. 42670 (proposed Aug. 14, 2000) ("Although the Yale study focused on men and women 18 to 49 years of age, the agency has no reason to believe that the increased risk of hemorrhagic stroke is limited to this population.")

[18] See also Gabrielle de Veber, Cerebrovascular Disease in Children, in 2 Pediatric Neurology, Principles & Practice 1099 (Kenneth F. Swaiman & Stephen Ashwal eds. 3d ed., 2000) ("[T]here has been no research studying medical therapy for childhood stroke. Current treatments are therefore, of necessity, based on therapies proven in adult stroke patients with biologic plausibility and safety data in pediatric patients when available.")

Children, and Adolescents, in Problems in Pediatric Drug Therapy 285 (Louis A. Pagliaro & Ann Marie Pagliaro eds. 4th ed., 2002) ("Neonates, infants, and young children are at substantially increased risk for [adverse drug reactions], primarily because of their immature drug elimination organ function, but also due to differences in other pharmacokinetic factors (i.e. volume of distribution).")

Plaintiffs' experts attest to the equally commonplace practice of extrapolation between the genders, based on, in significant part, the historical exclusion of women from scientific studies. Defendants' experts note current studies accounting for the differences between men and women, but do not establish that this very recent shift has yet effectuated a change in the practice of extrapolation. See Daubert Hearing Record (Apr. 28-30, 2003) at 427-30 (hereinafter "Record"). Until such a change occurs, the court will not deem this practice scientifically unreliable. See Rider, 295 F.3d at 1202 ("Given time, information, and resources, courts may only admit the state of science as it is.")[19]

Plaintiffs' experts clearly set forth the steps followed in extrapolating this evidence. See Domingo, 289 F.3d at 606.

---

[19] Additionally, plaintiffs' experts do not dispute that women may be at a greater risk from PPA than men, and stress that, in either gender, strokes are an "uncommon adverse reaction"; that only the "outliers" in the population are at risk. See Record at 132-33, 207-08, 297. They maintain the need for extrapolation given the unsurprisingly smaller amount of evidence directly relating to the male outliers.

While defendants demonstrate some of the problems posed by extrapolation and dispute the conclusions reached, they do not establish that plaintiffs' experts utilized scientifically unreliable methodologies. See Kennedy, 161 F.3d at 1230-31 (noting that defendant failed to introduce any evidence that expert's reasoning was not scientifically valid). The court finds the direct and extrapolated evidence sufficiently reliable evidence upon which to base expert opinion. As such, it also finds opinions as to these sub-populations admissible under Daubert.

4. Ischemic Stroke:

Ischemic stroke results from the blocking of blood flow in a cerebral vessel, depriving brain tissue beyond the blockage of oxygen. The vast majority of strokes are ischemic.

Defendants assert that plaintiffs lack scientific evidence and general acceptance in the medical community as to a causative relationship between PPA and ischemic stroke. Plaintiffs' experts, represented by Dr. Steven Levine at the Daubert hearing, opine that PPA, on rare occasions and in some people, can trigger an ischemic stroke.

Dr. Levine's opinion rests on case and adverse drug reports, biological plausibility, comparison to other sympathomimetics and naturally occurring conditions with altered sympathetic tone, PPA blood pressure studies, textbook and other references, and both his own and others' clinical experience. As noted above, the lack of epidemiological evidence does not render expert opinions

on this issue unreliable. See, e.g., Kennedy, 161 F.3d at 1229-30. However, in comparison to hemorrhagic stroke, plaintiffs' experts on ischemic stroke unquestionably rely on a smaller volume of evidence directly relating to PPA. For example, while numerous textbooks and treatises associate PPA with ischemic stroke, only a few published case reports and only some twenty-five percent of the stroke cases in the FDA SRS database involved ischemic injuries associated with PPA. As such, the court finds a more detailed analysis of the expert testimony and various lines of evidence appropriate.

Dr. Levine testified as to scientific cause and effect between PPA and ischemic stroke, looking to biological plausibility, temporal association, and dose response. He found temporal association demonstrated by the case and adverse drug reports, clinical experience, and textbooks, and pointed to evidence establishing that higher doses of PPA were more likely to cause an adverse response. In addressing biological plausibility, Dr. Levine identified the very same mechanisms postulated as triggers for PPA-induced hemorrhagic stroke, including an acute rise in blood pressure, vasoconstriction or vasospasm, and, in some cases, vasculitis. He maintained that an acute PPA-induced blood pressure increase can in some individuals disrupt the brain's autoregulation process, causing reactive vasoconstriction in blood vessels and leading to an ischemic stroke. He illustrates PPA's vasoconstrictive effect in its role as a nasal mucosa vasoconstrictor, constricting blood vessels and reducing blood

flow in order to treat nasal symptoms.

Dr. Levine supplements this theory by comparing PPA to other sympathomimetics, including amphetamine, cocaine, and ephedrine. He maintains that these agents share similar chemical structure, function, and effects, and can cause both ischemic and hemorrhagic stroke. Dr. Levine points to scientific literature and animal studies indicating that these other sympathomimetics both increase blood pressure and induce vasoconstriction,[20] and epidemiologic data demonstrating an ischemic stroke association to both amphetamines and cocaine. Plaintiffs also point to the American Heart Association's recent recommendation that ephedrine - which, according to Dr. Levine, has a lesser vasoconstrictive action than PPA - be removed from the market given its adverse cardiovascular effects.[21]

---

[20] See, e.g., Harold P. Adams, Jr. et al., Ischemic Cerebrovascular Disease 295-96 (2001) (the most commonly implicated drugs with respect to ischemic stroke, cocaine and amphetamines, are "both potent vasoconstrictors that lead to increased blood pressure"; "Narrowing (vasoconstriction) of the intracranial arteries has been found in persons with ischemic stroke following abuse of cocaine or methamphetamines.")

[21] See American Heart Association Urges Ban on Ephedra-based Supplements, at http://www.americanheart.org (May 14, 2003) ("The side-effects associated with [OTC ephedra-based dietary supplements] are primarily cardiovascular-related. A review of FDA data on reported events indicated high blood pressure, stroke, heart attacks and death linked to ephedra use. The American Heart Association believes that these reported events are the tip of the iceberg.") As noted, Dr. Levine also analogizes the effect of PPA to naturally occurring conditions with altered sympathetic tone, describing eclamptic and pre-eclamptic women suffering episodes of cerebral vasoconstriction and vasospasm resulting in ischemic and hemorrhagic stroke.

The fact that the mechanism remains unclear does not call the reliability of the opinion into question: "Not knowing the mechanism whereby a particular agent causes a particular effect is not always fatal to a plaintiff's claim. Causation can be proved even when we don't know precisely *how* the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage *somehow*." Daubert II, 43 F.3d at 1314. See also Daubert, 509 U.S. at 590 ("Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science.")

Plaintiffs bolster their theory on the mechanism behind PPA-induced ischemic stroke. The above-described human clinical trials and animal studies demonstrate PPA's effect on blood pressure. PPA's vasoconstrictive effect and ischemic stroke association finds support in scientific literature. See, e.g., Rashmi Kothari & William G. Barsan, Stroke, in Rosen's Emergency Medicine: Concepts and Clinical Practice at 1435 (John A. Marx et al. eds. 5th ed., 2002) ("Recreational drugs such as cocaine, [PPA], and amphetamines are potent vasoconstrictors associated with both ischemic and hemorrhagic stroke."); Harold P. Adams, Jr. et al., Ischemic Cerebrovascular Disease 297 (2001) (naming PPA as a medication with vasoconstrictive properties implicated as leading to stroke); Michael A. Sloan, Toxicity/Substance Abuse, in Primer on Cerebrovascular Diseases at 413 (K.M.A. Welch et al. eds., 1997) (associating PPA with vasospasm and beading).

See also Record at 631, 637-38 (although denying that PPA causes vasospasm, defense expert Dr. Brian Hoffman conceded PPA's vasoconstrictive effect).

Scientific literature also supports the practice of comparing PPA to other sympathomimetics. See, e.g., John C.M. Brust, Stroke and Substance Abuse, in Uncommon Causes of Stroke 133 (Julian Bogousslavsky & Louis R. Caplan eds., 2001) (describing PPA as an "amphetamine-like drug" and one of a group of psychostimulants with "well-recognized" ischemic or hemorrhagic stroke complications). Dr. Levine outlined the steps he utilized in applying evidence and research relating to these other agents to PPA. See Domingo, 289 F.3d at 606-07.[22] Just as with extrapolation between the sub-populations, defendants identify some of the problems in comparing PPA with other sympathomimetics. However, again, they do not demonstrate that this practice fails to accord with acceptable methods and procedures of science. See Kennedy,

[22] The court finds the Ninth Circuit cases excluding testimony relying on "similar but not identical" studies and evidence distinguishable. See, e.g., Domingo, 289 F.3d at 606-07 (expert's theory had never been published, and expert did not set forth the steps utilized in reaching a conclusion based on animal studies or point to studies supporting every necessary link in the theory of causation); Schudel, 120 F.3d at 997 (court found "no showing that necessary extrapolation [from studies involving either different agents or different types of exposure] was scientifically acceptable."); see also Rider, 295 F.3d at 1202 (expert relied on evidence that agent could cause ischemic stroke to prove it could cause hemorrhagic stroke).

161 F.3d at 1230.[23]

The expert opinions offered on the PPA/ischemic stroke association rest on more than simply the "*ipse dixit*" of the experts. Joiner, 522 U.S. at 146. In addition to the evidence proffered as to biological plausibility and through comparison to like agents, plaintiffs' experts rely on case and adverse drug reports, textbooks and treatises, and the clinical experience of several experts and other scientists. The court again finds that the cumulative effect of this evidence satisfies the mandate of Daubert. See, e.g., Kennedy, 161 F.3d at 1228-31; Hopkins, 33 F.3d at 1124-25 (finding expert testimony relying on, inter alia, clinical experience and studies, medical literature, and general scientific knowledge about a drug's properties based "on the types of scientific data and utiliz[ing] the types of scientific techniques relied upon by medical experts in making determina-

---

[23] Upon being asked what inferences were permissible in considering scientific evidence, defense expert Dr. Gregory Albers testified that, in the absence of high quality data, inferences could be made by looking to "biological plausibility, temporal associations, [and] wealth of anecdotal data." Record at 589. Dr. Levine followed this precise formula. Dr. Albers also agreed that there was "quite a bit of suspicion" as to the association between ischemic stroke and cocaine/amphetamines, and noted that he performed drug screens on his ischemic stroke patients Id. at 594-96. Additionally, in arguing against general acceptance, Dr. Albers pointed to a "strong scientific statement[,]" put out by the "very discerning" American Heart Association ("AHA"), not mentioning PPA as a risk factor for ischemic stroke. Id. at 581. He later opined that ephedrine, also not included in the aforementioned statement, has not been a well-accepted cause of ischemic stroke, just prior to learning that the AHA recently recommended its removal from the market. Id. at 584-85.

tions regarding toxic causation where there is no solid body of epidemiological data to review.") See also Glaser v. Thompson Med. Co., 32 F.3d 969, 972-75 (6th Cir. 1994) (finding scientifically reliable Dr. Zaloga's opinion that PPA-containing Dexatrim can cause severe hypertension, based on five of his own published studies, the published articles of other medical researchers, case reports, and his own clinical experience.")[24]

Admittedly, the purported PPA-ischemic stroke association poses a far more difficult question under Daubert than that presented by hemorrhagic stroke. Indeed, while Dr. Levine found "grade B" evidence for causality between PPA and hemorrhagic stroke, the evidence associating PPA with ischemic stroke, just as with hemorrhagic stroke in children and men, fell somewhere

---

[24] Contrary to defendants' assertion, the court finds nothing in the Glaser decision incompatible with the Daubert trilogy of cases. Defendants also point to circuit court decisions affirming exclusion of expert testimony relating to the drug "Parlodel." See Rider, 295 F.3d 1194 (11th Cir. 2002); Hollander v. Sandoz Pharms. Corp., 289 F.3d 1193 (10th Cir. 2002); Glastetter, 252 F.3d 986 (8th Cir. 2001). These decisions are not binding on this court and involved an entirely different drug. Moreover, no circuit court has yet reviewed any of the several different district court decisions finding Parlodel causation evidence scientifically reliable. As stated by the Tenth Circuit in Hollander: "[W]hen coupled with th[e] deferential [abuse of discretion] standard of review, Daubert's effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the [sic] same science may reach different results." 289 F.3d at 1206-07 (citing Ref. Manual at 27 and Brasher v. Sandoz Pharms. Corp., 160 F. Supp. 2d 1291, 1299 n.17 (N.D. Ala. 2001) (observing that the Eighth Circuit's decision in Glastetter "does not necessarily [establish] that an inconsistent holding by this court would constitute an abuse of discretion."))

below a "grade C," with "associated grade B" evidence from the class of like agents.

However, the court need not determine the accuracy of plaintiffs' experts' conclusions. As stated by the Ninth Circuit:

> Judges in jury trials should not exclude expert testimony simply because they disagree with the conclusions of the expert. The *Daubert* duty is to judge the reasoning used in forming an expert conclusion. The test is whether or not the reasoning is scientific and will assist the jury. If it satisfies these two requirements, then it is a matter for the finder of fact to decide what weight to accord the expert's testimony. In arriving at a conclusion, the factfinder may be confronted with opposing experts, additional tests, experiments, and publications, all of which may increase or lessen the value of the expert's testimony. But their presence should not preclude the admission of the expert's testimony - they go to the *weight*, not the admissibility.

Kennedy, 161 F.3d at 1230-31. See also Daubert, 509 U.S at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") (citing Rock v. Arkansas, 483 U.S. 44, 61 (1987)). Here, for the reasons described above, the court finds that plaintiffs' experts employed good science in reaching their conclusions. As such, the court finds plaintiffs' expert opinions on ischemic stroke admissible under Daubert.

5. Cardiac Injuries:

Plaintiffs also posit a causal relationship between PPA and cardiac injuries. The myocardial injuries identified include myocardial ischemia (angina; insufficient blood flow to heart

muscle tissue), myocardial infarction (heart attack), myocardial necrosis (destruction of heart muscle cells), myocarditis (inflammation of heart muscle walls), and cardiomyopathy (primary heart muscle mass disease). Plaintiffs also implicate some twelve different types of cardiac arrhythmias, including ventricular tachycardia (accelerated ventricular rhythm), ventricular fibrillation (contraction of ventricle), and bradyarrhythmia (deceleration of heart's rhythm).

Plaintiffs' expert, Dr. Irvin Goldenberg, attested to the relationship between PPA and cardiac injuries at the Daubert hearing. Lacking epidemiological evidence, Dr. Goldenberg drew upon animal studies, human clinical trials, case reports, clinical experience, comparison to other sympathomimetics, and textbook references. He testified as to, inter alia, biological plausibility, temporal association, and dose response. Thus, at first glance, Dr. Goldenberg's methodology mirrors that employed by Dr. Levine. However, upon closer analysis, the court finds critical distinctions between these expert opinions.

Applied across the broad spectrum of cardiac injuries, the evidence proffered by Dr. Goldenberg spreads far too thin to reliably support expert scientific testimony. See Joiner, 522 U.S. at 146 (court may conclude that there is simply too great an analytical gap between the data and the opinion proffered). For example, most of the myocardial injury case reports involved what Dr. Goldenberg referred to as "small heart attacks," while the textbooks he identified associate PPA with cardiomyopathy and

coronary artery disease. See Daubert Hearing Record (May 29, 2003) at 38-40, 43-44 (hereinafter "Record II"). The arrhythmia case reports similarly do not represent a preponderance of any particular type(s) of arrhythmia. The remaining lines of evidence, including several animal studies, human clinical trials, three cases recalled from Dr. Goldenberg's clinical experience, and a comparison to like agents, do not otherwise account for the breadth of injuries at issue.[25]

The evidence also fails to account for the incredible variety of proposed mechanisms. In comparison to the consistent explanations of proposed mechanisms for hemorrhagic and ischemic stroke, Dr. Goldenberg identified, by defendants' count, some thirty-five different biological mechanisms for the association between PPA and the various cardiac injuries. Dr. Goldenberg did not proffer support for his opinions as to the bulk of these mechanisms.

To the contrary, Dr. Goldenberg's primary explanation relied on PPA's vasoconstrictive effect. However, defendants' expert, Dr. Thomas Michel, testified that PPA's vasoconstrictive effect on coronary arteries was extremely limited. Id. at 84-86; 90-92. Dr. Michel testified that PPA's primary mechanism of action was

[25] The court is mindful of the fact that strokes may be broken down into numerous categories and sub-categories. However, in contrast to the experts on stroke, Dr. Goldenberg failed to provide comprehensive support for the various cardiac injuries or to demonstrate the propriety of considering cardiac injuries as a whole in relation to PPA.

its stimulation of alpha adrenergic receptors, resulting in PPA binding to those receptors and eliciting vasoconstriction. Because of the notably lower density of alpha receptors in coronary arteries, PPA was less likely to cause vasoconstriction in coronary arteries than in other vascular beds. This testimony calls into question Dr Goldenberg's opinion on the proposed vasoconstrictive mechanism for cardiac injuries attributed to PPA. Yet, neither Dr. Goldenberg, nor plaintiffs' counsel addressed this distinction during the Daubert hearing.[26]

Finally, deficiencies in the assorted lines of evidence further exacerbate the gap between Dr. Goldenberg's opinion and the evidence relied upon. For instance, while Dr. Goldenberg testified as to severe cardiac injuries stemming from PPA consumption, the case reports showed, in general, no long term adverse effects associated with PPA. See Record II at 36 (Dr. Goldenberg testified: "[A]ll these [myocardial injury] cases I'm going to tell you, they took the drug, they came in within a couple hours afterwards[.] When the drug was withdrawn, they had no problems that we know of.") and 60-62 (defendants' expert

---

[26] Plaintiffs later pointed to a single textbook only indirectly supporting their assertion that coronary arterial beds are as responsive to PPA's vasoconstrictive effect as cerebral arteries. See Brian B. Hoffman, Catecholamines, Sympathomimetic Drugs, and Adrenergic Receptor Antagonists, in Goodman & Gilman's: The Pharmacological Basis of Therapeutics at 222, table 10-2 (McGraw-Hill 10th ed., 2001) (showing that norepinephrine, which plaintiffs maintain PPA releases from nerve terminals as an indirect effect, has a greater effect on coronary blood flow than it does on cerebral blood flow).

testified that seven out of twenty arrhythmia case report patients spontaneously recovered without any treatment, while seven others recovered completely with treatment). Similarly, while Dr. Goldenberg presented testimony as to individuals consuming human therapeutic doses of PPA, three of the animal studies found no pathology at doses significantly beyond human therapeutic dose, including doses 1000 and 235 times that level. Id. at 75-76, 83-84. Also, beyond offering a few isolated examples, Dr. Goldenberg only alluded to the existence of numerous textbooks and treatises supporting his opinion.

Dr Goldenberg's scattershot expert testimony lacks both the cumulative evidentiary support and the thoroughness the court found reliable with respect to both hemorrhagic and ischemic stroke. Simply put, the evidence proffered by Dr. Goldenberg fails to reliably support his ultimate opinion. See Joiner, 522 U.S. at 146. As such, the court finds expert opinions as to a relationship between PPA and cardiac injuries inadmissible under Daubert.

## IV. CONCLUSION

For the reasons described above, the court GRANTS in part and DENIES in part defendants' motion to preclude plaintiffs' expert opinions as to general causation. The court finds expert testimony as to an association between PPA and hemorrhagic or ischemic stroke, in either gender and any age group, admissible. The court finds expert testimony associated with seizures, psychoses, injuries occurring more than three days after inges-

tion of a PPA-containing product, and cardiac injuries inadmissible.

DATED at Seattle, Washington this 18th day of June, 2003.

BARBARA JACOBS ROTHSTEIN
UNITED STATES DISTRICT JUDGE